SALT LAKE CITIZENS CONGRESS,
Petitioner,

v.

MOUNTAIN STATES TELEPHONE &
TELEGRAPH COMPANY, dba Moun-
tain Bell; the Public Service Commis-
sion of Utah, Respondents.

COMMITTEE OF CONSUMER SERVIC-
ES, DEPARTMENT OF COMMERCE,
DIVISION OF PUBLIC UTILITIES,
State of Utah, Petitioner,

v.

MOUNTAIN STATES TELEPHONE AND
TELEGRAPH COMPANY, dba Moun-
tain Bell; the Public Service Commis-
sion of Utah, Respondents.

Nos. 900020, 900076.

Supreme Court of Utah.

Dec. 31, 1992.

R. Paul Van Dam, Kent Walgren, Salt Lake City, for Committee of Consumer Services.

Floyd A. Jensen, Ted D. Smith, Salt Lake City, for Mountain Bell.

Bruce M. Plenk, Salt Lake City, for Salt Lake Citizens Congress.

David L. Stott, Salt Lake City, for Public Service Com'n.

STEWART, Justice:

The Salt Lake Citizens Congress and the Committee of Consumer Services seek a writ of review of the dismissal of their consolidated requests for agency action by the Public Service Commission. We reverse and remand.

## I.

During the late 1960s and the 1970s, there was much debate over whether a public utility could properly charge charitable contributions to its ratepayers. A large majority of states held that ratepayers could not be charged for a utility's charitable contributions because the contributions were made for the benefit of shareholders in the form of increased goodwill. *See, e.g., Alabama Power Co. v. Alabama Pub. Serv. Comm'n*, 359 So.2d 776, 779–80 (Ala. 1978); *Pacific Tel. & Tel. Co. v. Public Utils. Comm'n*, 62 Cal.2d 634, 44 Cal.Rptr. 1, 22–23, 401 P.2d 353, 374–75 (1965); *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 55 Ill.2d 461, 303 N.E.2d 364, 374–75 (1973); *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 607–08 (Iowa 1971); *Chesapeake & Potomac Tel. Co. of Maryland v. Public Serv. Comm'n*, 230 Md. 395, 187 A.2d 475, 485 (1963); *Re Northwestern Bell Tel. Co.*, 29 Pub.Util.Rep.4th (PUR) 7, 22–23 (Minn.Pub.Serv.Comm'n 1978). A minority of states reached the opposite conclusion and determined that because charitable contributions benefit society as a whole, they may be properly charged to ratepayers when made in reasonable amounts. *See, e.g., City of Miami v. Florida Pub. Serv. Comm'n*, 208 So.2d 249, 258–59 (Fla.1968); *New England Tel. &*

*Tel. Co. v. Department of Pub. Utils.*, 360 Mass. 443, 275 N.E.2d 493, 518–21 (1971); *United Gas Corp. v. Mississippi Pub. Serv. Comm'n*, 240 Miss. 405, 127 So.2d 404, 416 (1961).

In 1969, the Utah Public Service Commission granted Mountain States Telephone & Telegraph Company (Mountain Bell) a rate increase and announced that it was changing its previous rule of allowing Mountain Bell to charge charitable contributions to ratepayers. *Re Mountain States Tel. & Tel. Co.*, 78 Pub.Util.Rep.3d (PUR) 429 (Utah Pub.Serv.Comm'n 1969). The Commission stated:

There is one further adjustment which we have concluded to make in the above figures. The item designated miscellaneous income charges in the amount of $36,000 in the expenses shown above is not an operating expense account in the Uniform System of Accounts for Telephone Utilities. The system of accounts designates this account as a miscellaneous deduction from income on the income statement. An analysis of the actual charges included in this account for the year ended December 31, 1967, shows that approximately 70 per cent of the dollars in the account represent contributions to numerous organizations in Utah. The balance consists of dues and expenses for service clubs and other organizations paid by the petitioner on behalf of employees and a prorate of charges from the general office of Mountain States Telephone in Denver, Colorado. It can be assumed that the make-up of the charges in the account for the year 1968 are comparable in nature to those in 1967.

*In the past the commission has included miscellaneous income charges as a part of total expenses in determining the revenue requirements of Mountain States Telephone, but such items have been excluded by the commission in fixing the rates of the other major utilities operating in Utah.*

The commission finds that miscellaneous income charges in the amount of

$36,000 should be eliminated from the allowable expenses.

*Id.* at 439–40 (emphasis added). The italicized language in the opinion indicates that the Commission's ruling constituted a pronouncement of established Commission policy to be applicable as a general rule to Mountain Bell and all other major "utilities operating in Utah."

During the next seven years and through one general rate case, Mountain Bell abided by that ruling and charged contributions to its shareholders, not to ratepayers. In 1976, however, Mountain Bell submitted an application to the Commission for a rate increase that, for the first time since 1969, charged charitable contributions to ratepayers. An appendix to an exhibit submitted as part of the application presented a statement of projected income and expenses for the test year. The statement included a $65,000 "Miscellaneous" item that appeared to be added to the "Net Operating Income," but was in fact deducted to reach the "Net Operating Earnings."[1] The only explanation of the "Miscellaneous" category of expenses on the income statement was found on page 70 of the 74–page exhibit:

D. Other Income and Charges

. . . .

2. *Miscellaneous Deductions* —Includes the cost of abandoned projects, *charitable contributions*, membership dues, bond trustees fees, and the Federal income taxes related to these items.

(Emphasis added.)

Mountain Bell did not petition the Commission for authority to charge charitable contributions to ratepayers and, of course, the Commission did not rule on the lawfulness of Mountain Bell's changed treatment of that expense. In fact, the Commission's report and order made no comment on Mountain Bell's "Miscellaneous Deductions." Consequently, in 1976, the ratepayers began paying for Mountain Bell's charitable contributions, notwithstanding the Commission's 1969 ruling and the utility's seven-year practice of following that rule.

In December 1980, the Commission ordered all natural gas, electric, and telephone utilities to file written reports "setting forth in detail the accounting treatment by such utility of all political, charitable and other contributions made by said utility." Utah Power & Light, Mountain Fuel, and Continental Telephone Company responded to the order by describing their individual accounting practices and stating that the effect of their practices was to charge contributions to shareholders, not to ratepayers. Mountain Bell's response, however, did not indicate whether its contributions were charged to the shareholders; it merely stated, "Mountain Bell makes charitable and other contributions and accounts for them by following the rules and regulations set forth in Part 31 of the Uniform System of Accounts for Class A and B Telephone Companies. The account number used to account for such contributions is 323." Significantly, Continental Telephone, whose general accounting scheme should have paralleled Mountain Bell's, also recorded contributions in account number 323 under the Uniform Systems of Accounts, but unlike Mountain Bell, Continental Telephone specifically in-

**1.** The relevant portion of the income statement provided:

| | | Actual | Budget |
|---|---|---|---|
| . . . | | | |
| 24. | Net Operating Income | $24,157,000 | $23,476,000 |
| 25. | Interest Charged Constr. | 1,092,000 | 916,000 |
| 26. | Miscellaneous | 67,000 | 65,000 |
| 27. | Net Operating Earnings | 25,182,000 | 24,327,000 |

Two points are worth noting. First, although both the "Interest Charged Constr." and the "Miscellaneous" figures appear to be *added* to "Net Operating Income," the "Miscellaneous" figure is in actuality subtracted. This result is obscured by the fact that "Miscellaneous" is not shown as a negative figure. Second, the "Net Operating Earnings" amount on the income statement, not the "Net Operating Income," is the critical line indicating which expenses were charged to the ratepayers.

formed the Commission that its contributions were not charged to ratepayers.

The Commission sent copies of the utilities' responses to the Division of Public Utilities and asked the Division to analyze the responses. The Commission made clear the reason for its request: "Our principal area of concern is that no charges were made improperly 'above the line' or in other words to the ratepayers." Although Mountain Bell received a copy of the Commission's letter two weeks after filing its response, it did not apprise the Commission that it charged its contributions to ratepayers, and the Division did not comment on Mountain Bell's reply.

Each year from 1980 through 1985, Mountain Bell sought rate increases; its applications followed the same format and used similar exhibits as those presented in the 1976 general rate case. In each case, the words "charitable contributions" were mentioned only once, in the explanation of "Miscellaneous Deductions" located deep in an appendix to the income exhibits. In each case, the miscellaneous deductions constituted a single line item located *below* the net operating income line on the income statement, and charitable contributions were not specified on the income statement as part of the miscellaneous deductions. In each case, the Commission approved the rate increases without comment on miscellaneous deductions generally, or charitable or other contributions specifically.

In 1988, the Commission initiated a general rate case against Mountain Bell on the ground that the utility was earning an unusually high rate of return. Using the same format that it had used in 1976, Mountain Bell submitted an application that again charged charitable contributions to the ratepayers. During the proceedings, the Commission learned, apparently through the Division, that for the preceding eleven years Mountain Bell had charged all charitable contributions to ratepayers. Commissioner Stewart emphatically expressed the view that Mountain Bell

had been in clear violation of the law for some time in its treatment of charitable contributions:

> Before you or anyone else wastes any more time on it, I want to have the company make reference or read a case entitled "Re the Mountain States Telephone and Telegraph Company," it's Case No. 5972, dated April 11th, 1969 where this issue was decided by this Commission and we do not intend to spend any more time on it in this case unless you plan to seek a reversal of that decision.
>
>     . . . .
>
> Mr. Smith [attorney for Mountain Bell]: I was not aware of that case.
>
> Com. Stewart: Okay. The case held that charitable contributions were not to be taken [above] the line by Mountain States Telephone and Telegraph in that decision. We figured at a fine of $2,000 a day since 1969, this Commission probably owns Mountain Bell right now.

In its 1988 order, the Commission disallowed the $474,000 miscellaneous deduction and specifically ruled that charitable contributions were not to be treated as an above-the-line expense in any of Mountain Bell's future rate cases unless accompanied by a specific request for a change in Commission policy. Based on that order, the Director of the Salt Lake Citizens Congress (SLCC) wrote to Commissioner Stewart asking for "[s]ome form of redress" for Mountain Bell's past violations of the 1969 order. The Commission directed Mountain Bell and the Division to respond. Mountain Bell acknowledged that charitable contributions had been charged to ratepayers between 1976 and 1988, but disclaimed any intent to mislead the Commission. Mountain Bell asserted that it had fully complied with the Commission's 1980 inquiry and that its exhibits to its prior rate applications had "made it clear" that the Company had included charitable contributions as an above-the-line expense for rate-making pur-

poses.[2]

After reviewing Mountain Bell's response, the Division recommended that the Commission dismiss SLCC's complaint. Apparently more concerned with defending its own conduct than with the lawfulness of Mountain Bell's conduct, the Division justified its recommendation on the ground that the Division, its consultants, and other parties had overlooked the treatment of charitable contributions by telephone utilities since the mid–1970s. The Division explained that prior to 1983, it had relied primarily on outside expert consultants and the parties' experts. The Division then asserted that because no party had challenged the contributions in the relevant years, "it was not an obvious area of dispute." That statement, however, was correct only because utilities other than Mountain Bell had complied with the Commission's long-held position and because Mountain Bell had never petitioned the Commission to change its treatment of charitable contributions.

The Commission assigned SLCC's letter a docket number and dismissed the complaint without a hearing. SLCC and the Committee of Consumer Services (CCS) filed requests for review and a petition for rehearing. CCS also filed a separate request for agency action. The Commission consolidated the requests and ordered briefs and oral argument on three questions of law: (1) whether the Commission's 1969 order was binding on the Commission and Mountain Bell; (2) whether Mountain Bell's inclusion of expenses in rate cases after 1969 constituted a petition for relief from the 1969 order; and (3) whether granting the relief sought by SLCC and CCS would constitute retroactive rate making.

On the day of the hearing, CCS filed a motion to amend the complaints to include

allegations that Mountain Bell's response to the Commission's order of December 3, 1980, was misleading because Mountain Bell did not disclose that it was taking charitable contributions above the line. Although the motion to amend was not expressly granted, the Commission addressed the issue of the alleged misconduct. After a hearing before an administrative law judge, the Commission adopted the judge's findings of fact and conclusions of law and dismissed SLCC's and CCS's complaints.

In its findings, the Commission took administrative notice of Mountain Bell's general rate cases for the years 1976 through 1988 and stated that Mountain Bell's practice of charging charitable contributions to ratepayers was "fully disclosed" in those cases: "[T]he miscellaneous deductions account was unambiguously included as an 'above-the-line' expense [and] Respondent's witness unambiguously defined that account as including charitable deductions."

In its conclusions of law, the Commission held that (1) reopening past cases and granting reparations for the contributions charged against the ratepayers would violate the rule against retroactive rate making, (2) the 1969 order disallowing charitable contributions as an above-the-line expense was not subject to the rule of stare decisis and was therefore not binding on the Commission, (3) the Commission's 1969 order disallowing charitable contributions was not so explicit as to require Mountain Bell to obtain Commission authority to charge contributions to ratepayers in future cases, and (4) because Mountain Bell's "'concealment' was in plain sight," Mountain Bell's conduct did not constitute fraud on the Commission. Accordingly, the Commission denied SLCC's and CCS's requests for discovery with respect to the allegation of Mountain Bell's misconduct.

## II.

SLCC and CCS argue that the Commission erred in holding that its 1969 ruling

---

**2.** Mountain Bell characterized the exhibits it had filed in connection with its rate applications as "explicit testimony." That characterization may be technically correct, but only because of the peculiar way evidence is taken in rate proceedings. To call the exhibits "explicit testimony" does not mean that the evidence was, in fact, brought to the attention of the Commission.

with respect to charitable contributions was not binding on Mountain Bell in subsequent rate proceedings. They contend, on the basis of administrative res judicata, that the 1969 ruling was binding on Mountain Bell in all subsequent rate cases. We agree that the Commission's 1969 ruling on charitable deductions had the force of law and was thereafter binding on Mountain Bell, but on grounds other than res judicata.

■ Res judicata, often referred to as claim and issue preclusion, prevents the readjudication of issues previously decided. *See Penrod v. Nu Creation Creme, Inc.,* 669 P.2d 873, 874–75 (Utah 1983). *See generally Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074, 1078–81 (D.C.Cir.1987). The doctrine is premised on the principle that a controversy should be adjudicated only once. Although initially developed with respect to the judgments of courts, the same basic policies, including the need for finality in administrative decisions, support application of the doctrine of res judicata to administrative agency determinations. 4 Kenneth C. Davis, *Administrative Law Treatise* § 21:9, at 78 (2d ed. 1983); *Jeffries v. Glacier State Tel. Co.,* 604 P.2d 4, 8–9 (Alaska 1979). Indeed, the doctrine of res judicata has been applied to administrative agency decisions in Utah since at least 1950. *North Salt Lake v. St.*

*Joseph Water & Irrigation Co.,* 118 Utah 600, 611–12, 223 P.2d 577, 582–83 (1950).[3] In *Utah Department of Administrative Services v. Public Service Commission,* 658 P.2d 601, 621 (Utah 1983), we held, "[T]he principles of *res judicata* apply to enforce repose when an administrative agency has acted in a judicial capacity in an adversary proceeding to resolve a controversy over legal rights and to apply a remedy."[4]

■ Of course, res judicata has only limited applicability to some agency proceedings, such as rate cases where the predominant issue is what constitutes a just and reasonable rate for a future period. *Id.* What constitutes a just and reasonable rate of return, the cost of capital, and the various expense and revenue amounts cannot be decided on the basis of a prior rate proceeding, but must be determined anew in each rate case. Nevertheless, when the Commission rules in a rate proceeding that, as a matter of law, certain categories of expenses cannot be charged to ratepayers, that ruling establishes law that controls future cases, subject to the Commission's power to reverse itself in an appropriate manner. The binding effect of the rule does not, however, depend on res judicata.

Res judicata applies when there has been a prior adjudication of a factual issue and

**3.** For other cases applying administrative res judicata, see *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 325, 331–36, 433 A.2d 620, 624–26 (1981) (determination that mismanagement occurred in the construction of a power unit); *Re Kansas City Power & Light Co.,* 75 Pub.Util.Rep.4th (PUR) 1, 132–34 (Mo.Pub.Serv.Comm'n 1986) (decision that power outage was not result of mismanagement); *Re Public Service Electric & Gas Co.,* 48 Pub.Util.Rep.4th (PUR) 79, 83–84 (N.J.Bd. of Pub.Utils.1982) (determination that electric utility's subsidiary fell within the Board's jurisdiction).

**4.** *Administrative Services* relied on *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), where the United States Supreme Court held, "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have

had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose."

Other courts and commissions have adopted the *Utah Construction* rule of administrative res judicata. *See, e.g., Second Taxing Dist. of the City of Norwalk v. FERC,* 683 F.2d 477, 484 (D.C.Cir.1982); *Anthan v. Professional Air Traffic Controllers Org.,* 672 F.2d 706, 709 (8th Cir. 1982); *Jeffries v. Glacier State Tel. Co.,* 604 P.2d 4, 8–9 (Alaska 1979); *Re Kansas City Power & Light Co.,* 75 Pub.Util.Rep.4th (PUR) 1, 133 (Mo. Pub.Serv.Comm'n 1986); *Cincinnati Bell Tel. Co. v. Public Utils. Comm'n of Ohio,* 12 Ohio St.3d 280, 466 N.E.2d 848, 852 (1984); *see also State ex rel. Utilities Comm'n v. Carolinas Comm. for Indust. Power Rates & Area Dev., Inc.,* 257 N.C. 560, 126 S.E.2d 325, 333 (1962); *Public Util. Comm'n v. Coalition of Cities for Affordable Util. Rates,* 776 S.W.2d 224, 226–28 (Tex.Ct.App. 1989).

an application of a rule of law to those facts. In other words, res judicata bars a second adjudication of the same facts under the same rule of law. Here, the amounts of Mountain Bell's charitable contributions varied in every rate case after 1969. Thus, the Commission's ruling in that year was not technically res judicata as to subsequent rate cases.

However, the Commission's 1969 ruling had a binding legal effect under the doctrine of stare decisis. The adjudication of every case requires the application of one or more rules of law. A rule of law, whether pre-existing or newly established, that serves as the major premise of an adjudicatory syllogism, necessarily governs all subsequent cases properly falling within the scope of the rule. This is so even when the particular facts in subsequent cases are different and res judicata does not apply.

■ We have previously stated that stare decisis has limited applicability to administrative agency cases, *see Williams v. Public Serv. Comm'n,* 754 P.2d 41, 52 (Utah 1988), but that is because of the innumerable informal kinds of decisions that administrative agencies make. This limitation does not apply where administrative law making is done pursuant to formal procedures similar to those employed in judicial proceedings. As Professor Davis has stated:

> The fact is that many agencies do make law by adjudication, building bodies of precedents that are followed, distinguished, or overruled, and that the agencies' law is largely in the collections of prior decisions. For instance, the Interstate Commerce Commission has 354 bound volumes of ICC Reports and 130 bound volumes of Motor Carrier Cases, and the National Labor Relations Board has 255 volumes of published opinions. In such volumes, stare decisis is probably about as strong as it is in federal courts.

4 Davis, *Administrative Law Treatise* § 20:9, at 31. The doctrine of stare decisis, properly applied, is an essential component in establishing the rule of law in the arena of administrative law. Administrative agencies, like courts, have authority to establish rules of law, and they do so in two ways: by promulgating rules and by issuing decisions as a necessary incidence of adjudication.[5] *E.g., SEC v. Chenery Corp.,* 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1579–81, 91 L.Ed. 1995 (1947). Indeed, agency law making by both quasi-judicial adjudication and quasi-legislative rule making is essential to the workings of most administrative agencies.

■ Concededly, law making through the promulgation of rules has certain advantages over law making by adjudication. However, while prospective resolution of legal issues by rule making is generally desirable, an agency cannot possibly anticipate all the unresolved legal issues that will arise under the statutes and rules the agency administers. *Id.* at 202–03, 67 S.Ct. at 1580–81. Thus, the agency must be able to resolve interstitial legal issues when they arise in the context of adjudication. *Id.* In short, an agency must have the power to establish rules of law on a case-by-case basis within the context of its statutory authority. *Id.; NLRB v. Bell Aerospace, Inc.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974), *overruled on other grounds, NLRB v. Hendricks County Rural Elec. Membership Corp.,* 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981); *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 765–66, 89 S.Ct. 1426, 1429–30, 22 L.Ed.2d 709 (1969); *Pacific Gas & Elec. Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974); 2 Kenneth C. Davis, *Administrative Law Treatise* § 7:25, at 118–28 (2d ed. 1979), § 7:25, at 225, 258–63 (Supp.1989).

5. The authority of state administrative agencies to establish legal rules is limited by the agency's organic statute, statutes the agency administers, constitutional law, and the Utah Administrative Procedures Act (UAPA), Utah Code Ann. §§ 63– 46b–1 to –22, enacted in 1987 and made effective January 1, 1988. Specific procedures for rule making have also been established by statute since 1973. Utah Code Ann. §§ 63–46a–1 to –16 (1989 & Supp.1992).

■ Rules of law developed in the context of agency adjudication are as binding as those promulgated by agency rule making. *Pacific Gas & Elec. Co.*, 506 F.2d at 38. Thus, rules of law established by adjudication apply to the future conduct of all persons subject to the jurisdiction of an administrative agency, unless and until expressly altered by statute, rule, or agency decision. That does not mean, however, that a rule of law established in adjudication can never be changed by the agency that established it. Administrative agencies must, and do, have the power to overrule a prior decision when there is a reasonable basis for doing so. As this Court stated in *Reaveley v. Public Service Commission*, 20 Utah 2d 237, 241, 436 P.2d 797, 800 (1968), "Certainly an administrative agency which has a duty to protect the public interest ought not be precluded from improving its collective mind should it find that a prior decision is not now in accordance with its present idea of what the public interest requires." *See also NLRB v. Wyman–Gordon Co.*, 394 U.S. at 765–66, 89 S.Ct. at 1429–30.

■ The Public Utilities Act implicitly acknowledges the Commission's power to establish rules of law in adjudicatory proceedings. *See generally* Utah Code Ann. §§ 54–1–1 to –13–6 (1990 & Supp.1992). Since 1917, the Commission has been required to institute an action against a public utility if it violates or threatens to violate "anything required of [the utility] by law, or by any order, decision, rule, direction or requirement of the commission." 1917 Utah Laws ch. 47, § 23; Utah Code Ann. § 54–7–24 (1990). The careful distinction in the statute between an "order" and a "decision" highlights the Commission's adjudicatory law-making power. The word "order" refers to a specific legal obligation or duty running to a particular utility and is like a judgment or decree in the judicial context. Simply stated, an order is an agency command to do or to refrain from doing a specific act in a specific factual context.

■ The term "decision" has a different meaning. A decision also arises from an adjudicatory proceeding, but may establish one or more rules of law of general applicability. A utility need not be a party to be bound by the rules of law established by an adjudication. In short, a rule of law announced in a decision of the Commission is as binding on a utility as a rule formally promulgated in a rule-making proceeding.[6] *See, e.g., Pacific Gas & Elec. Co.*, 506 F.2d at 38.

■ In its 1969 order, the Commission stated that it had not allowed other utilities to charge contributions to ratepayers and specifically ruled that Mountain Bell could not do so. The 1969 proceeding produced both an "order" and a "decision," as those terms are defined above. The order established Mountain Bell's rates for that case, and the decision established a general rule of law that charitable contributions could not be charged to ratepayers. That quasi-judicial decision was binding on Mountain Bell in all future rate cases, irrespective of the amount of the contributions, until either the Commission specifically overruled the decision or the decision was changed or set aside by formal rule, statute, or court decision.

It is both significant and consistent with what we have said that the Commission treated the issue of the deductibility of charitable contributions as settled law when it undertook its 1980 inquiry into how the utilities in the state treated contributions. It is also significant that the other utilities, Mountain Fuel, Utah Power & Light, and another telephone company,

---

6. In accordance with the rules stated above, the Legislature in 1987, in the Administrative Rule Making Act, exempted "rulings [or decisions] by an agency in adjudicative proceedings" from the definition of "rule." 1987 Utah Laws ch. 241, § 1; Utah Code Ann. § 63–46a–2(13)(c)(vii) (1989). The Code currently requires that every agency enact decisional rules into legislative rules within 120 days after the decision is announced. Utah Code Ann. § 63–46a–3(6) (1989).

Continental, all recognized what the Commission was driving at in its inquiry and all indicated that they charged contributions to shareholders. Conspicuously, Mountain Bell did not respond as the others did, but filed a response that did not disclose its practice of charging charitable contributions to ratepayers.

In sum, the Commission's 1969 decision holding that Mountain Bell could not charge charitable contributions to ratepayers established a rule of law binding on Mountain Bell in subsequent rate cases. The Commission erred in holding otherwise.

## III.

■■■ Mountain Bell argues that its submissions to the Commission in 1976 and subsequent cases constituted petitions to approve a change in the law with respect to charitable contributions. This argument is without merit.

Mountain Bell never filed a petition asking the Commission to rule on the issue or to reconsider its 1969 ruling. In fact, Mountain Bell never directed the Commission's attention to the issue, and the Commission never addressed it. Under these circumstances, it cannot be said that the Commission intended to change a rule of law by silence. If, in fact, the Commission had intended to change the law by its silence and inactivity, it would have discriminated against those utilities that had not charged charitable contributions to ratepayers.

## IV.

Mountain Bell argues that even if it were bound by the 1969 decision, an order compelling it to pay reparations or to refund the illegally charged expense would violate the rule against retroactive rate making.

■■■ The rule against retroactive rate making precludes adjustments of approved rates to correct errors or missteps in the rate-making process. *Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 720 P.2d 420, 423–24 (Utah 1986). The fundamental policy embodied in that rule, however, does not permit a utility to subvert the integrity of rate-making proceedings by misconduct that affects rates in a manner favorable to the utility. We recently stated in *MCI Telecommunications Corp. v. Public Service Commission,* 840 P.2d 765, 775 (Utah 1992), "A utility that misleads or fails to disclose information pertinent to whether a rate-making proceeding should be initiated or to the proper resolution of such a proceeding cannot invoke the rule against retroactive rate making to avoid refunding rates improperly collected."

Here, the allegations clearly fit within the scope of the exception to the rule against retroactive rate making announced in *MCI.* Without any discovery, and contrary to strong inferences on the face of the record, the Commission ruled that Mountain Bell had not engaged in misconduct. The Commission stated that "[t]he 'concealment' was in plain sight" and that "[b]efore we can expect to be sustained in the imposition of sanctions, or ordering refunds, we believe more must be shown [than] obtuseness—deliberate or otherwise."

If in fact the "concealment" was "in plain sight," the Commission and the Division were derelict in their responsibilities to the ratepayers and the public. Be that as it may, the Commission was far too quick to absolve Mountain Bell of misconduct. The issue is whether Mountain Bell engaged in misconduct by violating the Commission's rule of law on the deductibility of charitable contributions.

■■■ Rate-making proceedings are *not* to be conducted on the basis of gamesmanship. The disclosure of charitable contribution expenses near the end of a multi-page exhibit attached to financial statements and under the general heading of "Miscellaneous" expenses does not comply with Moun-

tain Bell's duty to petition the Commission to change its ruling on charitable contributions. Indeed, Mountain Bell's presentation of this expense was not in any way calculated to attract the attention of the Commission. As a party to the 1969 case, Mountain Bell must have known of the Commission's decision regarding charitable contributions. Despite its knowledge of that ruling, Mountain Bell simply disobeyed it. For the Commission to ignore these facts is worse than an abuse of discretion; it is an abdication of its responsibility to the public.

For Mountain Bell to assert that its treatment of charitable deductions was in "plain sight" is simply a play on words.[7] It was in plain sight only to those who might suspect that Mountain Bell might not comply with the law and who knew where and what to look for in a highly technical 74–page exhibit. It was not in plain sight to those who had a right to expect Mountain Bell to abide by the law and petition the Commission to change its ruling if it believed that such a change was appropriate. That kind of semantic gamesmanship on the part of utilities is intolerable and clearly in violation of Mountain Bell's duty to abide by the law. The Commission's ruling to the contrary is erroneous.

Moreover, the Commission unjustifiably compounded its dereliction by ruling that petitioners could not engage in discovery or present evidence. This Court in *MCI* held that the Commission's failure to hold a factual hearing on the issue of utility misconduct was arbitrary and capricious given the allegations made to the Commission and the facts appearing in the record. *MCI*, 840 P.2d at 775. Here, several facts in the record support the allegation that Mountain Bell intentionally misled the Commission. Mountain Bell was necessarily aware in 1969 that the Commission refused to permit charitable contributions to be charged to ratepayers. In the 1976 and subsequent rate cases, Mountain Bell charged charitable contributions to ratepayers without petitioning the Commission to change the law. Mountain Bell's violation of the 1969 ruling was done either inadvertently or in culpable disregard of its duty. Mountain Bell has not argued before this Court that it acted inadvertently, but has, in essence, claimed the right to do what it did. The so-called "disclosure" of its treatment of charitable contributions contrary to the 1969 decision cannot absolve Mountain Bell from its responsibility to either comply with that decision or petition the Commission for a change in the law.

Finally, Mountain Bell knew that prior to 1983 the Division relied almost exclusively on a utility's expert witnesses for accurate figures and proper accounting.[8] For that reason, Mountain Bell had a special duty to be forthright and candid with the Commission. Instead, when specifically asked about its treatment of charitable contributions in 1980, Mountain Bell failed to disclose that it charged those contributions to ratepayers, even though it must have known that the Commission's inquiry was primarily concerned with that issue.

Given petitioners' allegations and the facts appearing on the record, we hold that the Commission acted arbitrarily and capriciously in denying petitioners' request for discovery and in failing to hold a factual hearing on whether Mountain Bell engaged in misconduct. *See* Utah Code Ann. § 63–46b–16(4)(h)(iv) (1989).

---

7. In presenting the miscellaneous expenses as a positive, rather than a negative, figure in its 1976 projected income statement, Mountain Bell made its accounting treatment of charitable contributions even more difficult to ascertain.

8. In the 1976 case, the Division engaged an outside accounting firm "to conduct an extensive examination of the exhibits of Mountain Bell." The firm's testimony, however, only went to changes in the test period proposed by Mountain Bell and to issues on test year adjustments argued by the parties. Unlike Mountain Bell, the outside firm cannot be charged with knowledge of the 1969 decision, nor can it be charged with the duty to bring the changed treatment of charitable contributions to the attention of the Commission.

The Commission's order dismissing the action is vacated, and the case is remanded for further proceedings consistent with this opinion.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.