Justin C. STEWART, George L. Gigi, A. Earl Cox, Barbara Toomer, Ronald Turpin, and Pat Coryell, Petitioners,

v.

UTAH PUBLIC SERVICE COMMISSION and U.S. West Communications, Inc., Respondents.

Division of Public Utilities and Committee of Consumer Services, Intervenors.

No. 910405.

Supreme Court of Utah.

July 29, 1994.

Rehearing Denied Nov. 8, 1994.

James L. Barker, John J. Flynn, Salt Lake City, for petitioners.

R. Paul Van Dam, Atty. Gen., David L. Stott, Kent Walgren, Michael L. Ginsberg, Asst. Attys. Gen., Salt Lake City, for Div. of Public Utilities, Public Service Com'n, Committee of Consumer Services.

Floyd A. Jensen, Ted D. Smith, Salt Lake City, for U.S. West Communications.

Felshaw King, Kaysville, and Fred B. Goldberg, Steven Zaleznick, Washington, DC, for amicus curiae American Ass'n of Retired Persons.

STEWART, Associate Chief Justice:

This case is here on a petition to review an order of the Utah Public Service Commission that increased U.S. West Communications, Inc.'s (USWC) authorized rate of return on equity to 12.2%, ordered central office modernizations and fiber-optic extensions to educational institutions, and adopted an incentive regulation plan that USWC vetoed pursuant to statutory authorization. The petition to review was filed by Justin C. Stewart and other telephone users and ratepayers (collectively "ratepayers") who challenge (1) the lawfulness of the 12.2% rate of return on equity and (2) the constitutionality of Utah Code Ann. § 54–4–4.1 (1990), which authorizes the Commission to approve incentive rate regulation plans and allows a utility to veto such plans. The ratepayers also contend that even if the statute authorizing such plans is constitutional, the incentive plan adopted by the Commission is unlawful. Lastly, the ratepayers seek an award of attorney fees. We hold that a 12.2% rate of return on equity is not just and reasonable, the veto provision in Utah Code Ann. § 54–4–4.1(2) is unconstitutional, the Commission's incentive regulation plan is unlawful, and the ratepayers are entitled to reasonable attorney fees.

## I. BACKGROUND

USWC, a regulated public utility, operates in a number of western states. It is a wholly owned subsidiary of U.S. West, Inc., an un-regulated industrial company that provides various telecommunications products and services. In this proceeding, the Commission and the Division of Public Utilities have aligned themselves with USWC. The Committee of Consumer Services intervened in the proceedings before the Commission but has taken no position on this appeal and has not appeared as a party.

These proceedings began when USWC petitioned the Public Service Commission for approval of an incentive regulation plan whereby USWC shareholders and Utah ratepayers would share company profits in excess of a specified rate of return on equity. The case was assigned docket No. 90–049–03. USWC's proposed plan provided that (1) telephone rates could not be lowered for four years, irrespective of how high USWC's rate of return was, but could be increased on a cost pass-through basis for four categories of costs; (2) USWC could not file for a rate increase unless its profits for one year amounted to less than a 10.5% return on equity (presumably a nonconfiscatory rate of return); and (3) USWC would retain all earnings up to a 14% return on equity, and USWC shareholders and Utah ratepayers would share equally in earnings from 14% to 17%. The plan did not indicate what a fair and just rate of return on USWC's investment would be.

After USWC filed its proposal, the Division of Public Utilities filed a petition to investigate USWC's earnings. That petition, assigned docket No. 90–049–06, resulted in a general rate proceeding before the Commission. The Commission consolidated the two cases.[1] While the cases were pending, the Commission ordered two prospective interim rate reductions, $10,711,000 on June 22, 1990, and $8,238,000 on January 1, 1991. All issues concerning revenue requirements, except cost of capital and depreciation, were disposed of by stipulation between USWC, the Division, the Committee of Consumer Services, and AT & T. Even though the propriety of resolving such important issues as the revenue requirements of a public utili-

---

1. USWC filed a separate appeal that is the subject of our opinion in *U.S. West Communications,* *Inc. v. Public Service Commission,* 882 P.2d 141 (Utah 1994).

ty by private stipulation with no findings of any kind by the Commission is highly questionable, no one has challenged that procedure in this case. *See Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 614 P.2d 1242, 1245 (Utah 1980). The Commission accepted the stipulation, but in its Report and Order noted, "The Commission could not have been presented a more penetrating example of the problematic nature of stipulations. Here, signatory parties could not agree on what their own words meant and seized this dispute as an opportunity to advance their own interests on what otherwise might have been reasonable grounds." The Commission did not otherwise comment on the far-reaching public policy and legal implications of deciding such important issues in a general rate case on the basis of a stipulation that precludes all Commission scrutiny of critical data, notwithstanding cases from this Court disapproving such an approach. *See id.*[2]

On June 19, 1991, the Commission entered its Report and Order in both dockets. The Commission ordered USWC to further "reduce its revenues [prospectively] by $19,799,-000," thereby ordering a total future revenue reduction of $38,748,000 during the course of the case. The Commission also authorized an increased rate of return on equity of 12.2% and rejected USWC's incentive plan.

With respect to incentive regulation plans generally, the Commission found:

We are being asked to make a significant departure from the current scheme of regulation in the state of Utah.... [T]raditional regulation is performing relatively well in this jurisdiction. Ratepayers have received a series of rate reductions over

the past four years, the Company continues to earn in excess of its authorized rate of return and the telephone network appears to have met the basic needs of its customers. In addition, telephone subscribership in this state is at an all time high level (96.5 percent as of March, 1990) and is well above the national average of 93.3 percent. No one argues that the system is perfect, but concrete evidence that it is failing in any major respect is absent from this record. On the other hand, the record in this case shows that the promised benefits of the incentive regulation proposals before the Commission are speculative and the possibility exists that unless a specific incentive regulation plan is carefully crafted, there is risk of harm to the ratepayers. That could occur in the form of higher rates than ratepayers would have otherwise paid, or a windfall to shareholders in the form of higher earnings than their investment risk would otherwise justify, as will be discussed in more detail later.

... The evidence on the record does not substantially corroborate the assertions made by proponents of incentive regulation either in their attacks on traditional regulation or in support of the benefits of incentive regulation.

In rejecting USWC's incentive plan, the Commission made a number of specific findings that support its ruling rejecting USWC's plan but that are also inconsistent in general with the incentive plan the Commission itself ultimately promulgated and, in addition, with its ruling on the rate of return. For that reason, we set out an extensive

---

**2.** We recently disapproved the use of stipulations to resolve significant issues in rate cases. In *MCI Telecommunications Corp. v. Public Service Commission,* 840 P.2d 765 (Utah 1992), we stated:

Moreover, the fixing of utility rates by private negotiation with no findings of fact raises serious questions about the legality and integrity of the procedures the Commission employed. The Commission serves a crucial role in protecting ratepayers from overreaching by entities with monopoly power that provide essential services. We have on many occasions emphasized that the Commission must make appropriate findings of fact to justify rate or-

ders. In *Utah Department of Business Regulation v. Public Service Commission,* 614 P.2d 1242, 1245 (Utah 1980), we stated that the first prerequisite of a rate order is that it be preceded by a hearing and findings. We explained:

A state regulatory commission, whose powers have been invoked to fix a reasonable rate, is entitled to know, and before it can act advisedly must be informed of all relevant facts. Otherwise, the hands of the regulatory body could be tied in such fashion it could not effectively determine whether a proposed rate was justified.

*Id.* at 773 (quoting *Utah Dep't of Business Regulation,* 614 P.2d at 1246).

portion of the Commission's findings in support of its rejection:

One of the major witnesses sponsored by the Company in this proceeding was Professor Davidson who spoke in favor of incentive regulation as a means of addressing the emergence of competition on the national and international scene. Yet other Company witnesses testified that the Company's incentive regulation plan was not designed to meet the concerns of competition.

The Company could not produce an analysis of the impacts upon the ratepayers of incentive regulation. *Company witnesses testified that it is impossible to quantitatively demonstrate that rates under an incentive plan will be equal to or lower than rates under traditional regulation. There was, however, testimony by the Company that adoption of an incentive regulation plan would increase the cost of capital to the Company due to higher risks. In addition, Company witnesses testified that one of the advantages of incentive regulation is that it encourages "risk taking" by the Company but that ratepayers would be exposed to the risk of Company failure since investment made during the course of the incentive plan will be in rate base at the end of the plan.*

. . . .

The Commission finds that the record does not fully support the arguments by proponents of incentive regulation that the Company lacks incentives to be efficient under current regulation. It further finds that the record is deficient in evidence that the incentive regulation plans proposed in this proceeding will create the incentives for efficiency promised. There is also an absence of evidence to fully support the contention that ratepayers will benefit from the adoption of the Company's or the Division's proposed incentive regulation plans.

2. [The argument] that traditional regulation retards the rate of technological innovation which will be corrected under an incentive regulation plan ... flies in the face of a long-established principle, that if the Company is allowed the opportunity to earn the allowed rate of return (market cost of capital) on its utility investment, and with rates linked to that investment in the form of rate base, the utility has an incentive to increase investment in order to increase the absolute level of its profits.

The Company offered no concrete evidence to counter this widely accepted view. The Company did not offer any example of investments not made, technologies withheld from Utah because of a lack of incentive, or services not offered in Utah because the Company had no incentive to earn additional revenues.

The Company has asserted in a number of proceedings before this Commission, and in this proceeding, that it faces a serious threat from competition. It is hard to accept the theory that the Company would withhold introduction of new technologies or new services that would help it meet that competition simply because an incentive regulation plan did not exist in Utah. There is evidence, however, that USWC has invested considerable sums in recent years in introducing new technologies and improving the telecommunications infrastructure generally. In addition, it appears that the independent telephone companies that operate in the state have had the incentive under traditional regulation to modernize their systems to a major degree.

There is also evidence that liberal depreciation policies, such as those adopted by this Commission since 1985, have a more direct and substantial impact upon modernization decisions than would an incentive regulation plan.

Some company witnesses argued that under traditional regulation the Company is put at risk in its modernization efforts by arguments that certain investments are not prudent, yet the Company offered no evidence that this Commission has ever declared any investment by the Company to be imprudent and thus not allowable in rate base.

The Commission therefore finds that there is insufficient evidence to justify the assertion that traditional regulation, as implemented in this jurisdiction, discourages

modernization or the introduction of new technologies or services. Furthermore, the Commission does not find valid the evidence on this record which purports to substantiate the assertion that adoption of incentive regulation would lead to more rapid deployment of new services or technologies.

3. *The argument that traditional regulation has an anti-investment bias....* It appears that the essence of this argument is that the Company is discouraged from investing in activities and jurisdictions where the return is not as high as other jurisdictions or business opportunities. *In fact, Company witnesses asserted on the record that all the Company is really after is a higher return on its investment. The Commission finds that a commitment by the Company to the provision of public service and an opportunity to earn the allowed rate of return equal to the market cost of capital, as determined by this Commission, provides an appropriate long-term basis upon which investment decisions should be made by the Company.*

4. *The specific elements of the Company plan rejected by the Division and the Committee.*

a. *The proposed gap between the authorized rate of return and the sharing level of 14 percent.* We believe that the evidence on the record shows that such a gap would result in a windfall to the Company at the expense of the ratepayers. The studies of Division witnesses Compton and Henningsen substantiate this conclusion. Testimony of MCI witness Cornell to the effect that such a gap would reward the Company for "easy efficiencies" is further evidence. The Commission therefore finds that the record does not justify the existence of a gap between the rate of return authorized by the Commission in this proceeding and the point at which the ratepayers begin to share in the results of Company efficiencies.

b. The proposed pass-through items proposed in the Company plan. One of the more public assertions made by the Company both before the proceeding be-

gan (as established in the numerous letters received by the Commission in support of the proposed modernization and incentive plans, which letters were apparently generated in large part by the active lobbying of the Company) and during the course of the proceeding, was that rates would be frozen during the duration of the incentive regulation plan. Yet the Company has requested that rates be allowed to increase in the event the four designated pass-through items require it. The parties that argued against the inclusion of pass-throughs contended that by selecting items that would in all likelihood result in increases in rates, but excluding factors that would in all likelihood result in additional revenues to the Company is not fair to ratepayers. It was further argued that such pass-throughs are single-item rate cases which have been declared illegal in this jurisdiction. The Commission finds that the arguments against pass-throughs are persuasive and we will not allow them in any plan approved by the Commission.

. . . .

Based on the foregoing, the Commission cannot adopt the incentive plan of either the Company or the Division as presented to the Commission. *We find that the adoption of such plans in their current forms would not result in the promised efficiencies or investments nor would they be of benefit to the ratepayers of this state.*

After rejecting USWC's plan, the Commission adopted an incentive plan that it devised on its own without a hearing or argument. That plan was to be in effect for five years, subject to termination by order of the Commission. Rates were to be frozen during that period, subject to certain exceptions. Under the plan, USWC would share profits in excess of the authorized 12.2% rate of return on equity pursuant to the following formula:

| | Ratepayer Share | Company |
|---|---|---|
| Up to 12.2% | 0 | all |
| 12.2 to 13.2% | 80% | 20% |
| 13.2 to 14.2% | 60% | 40% |
| 14.2 to 17% | 50% | 50% |
| over 17% | all | 0 |

The Commission offered no justification for the plan, other than the bald conclusion that the plan would increase the company's efficiency, a conclusion that is contrary to the Commission's findings rejecting USWC's plan. The Commission stated with respect to its incentive plan "that proper monetary incentives may increase the efficiency of the Company." The Commission did not explain how those "monetary incentives" would increase efficiency and failed to provide any means for preventing USWC from enhancing profits by achieving false efficiencies, such as could be produced by reducing expenditures for maintenance and customer services. Increased profits are not, by any means, an indication of greater efficiency by a public utility.

The Commission's admission that the best argument in favor of incentive regulation was simply "intuition" makes clear that its reliance on greater efficiency was a hollow rationale. The Commission stated:

> Of all the arguments put forth by the proponents of incentive regulation, the one with the most appeal is the one with no basis other than "intuition." If we make it possible for the Company to increase its

earnings by becoming more efficient through a properly crafted incentive plan, including an assurance that the rates that we begin with are such that the Company will not enjoy a windfall, the promise of increased earnings is motivation enough that efficiencies will probably result.

(Emphasis added.)

Furthermore, the Commission offered no rationale in support of the various revenue sharing percentages in excess of the 12.2% return on equity, although it did remark that ratepayers should be allowed "to receive at least some benefit of overearnings." Given the unprecedented record of USWC's excessive earnings over a period of at least five years, see note 12 *infra* and accompanying text, the sharing of some excess profits with the ratepayers might provide some justification for the plan.[3] Nevertheless, the Commission did not indicate how its allowing USWC to retain such a large portion of earnings in excess of a fair return—even half the earnings from 14.2% up to 17%—justified that policy, especially since the plan would deprive ratepayers of the right to rates based on a just and reasonable rate of return.[4]

3. The Commission stated:

Another argument in favor of a carefully crafted plan is that the sharing of overearnings, the annual accounting of earnings, and the allowance of a return of their share of the earnings in some manner in the subsequent year, permits the ratepayers to receive at least some benefit of overearnings. In the past several years of consistent overearnings by the Company, such overearnings have benefitted only the shareholders.

4. In addition to the revenue sharing plan set out in the text, the Commission's incentive plan provided:

1. Rates will be frozen except as modified pursuant to item 6 hereafter and subject to revenue neutral changes in rates ordered by the Commission as a result of contemplated cost-of-service monitoring on a regular basis.

2. Regulation of the Company will continue in all respects as with traditional regulation, except as modified by this Order.

. . . .

5. There will be no pass-through adjustments.

. . . .

7. The term of the plan is for five years. The Commission can terminate the plan at any time if it is convinced that the public interest

justifies termination. At any time during the duration of the plan the Company can request a rate case. In addition, at any time the Division or the Committee can request the Commission to undertake an investigation of the rates and charges of the Company. However, the Company, the Division and the Committee will have to overcome the presumption that it is in the public interest that the plan be allowed to go the entire five-year experimental period.

8. The plan will include the service performance standards proposed by the Division in this proceeding. It is the Commission's intention, however, to conduct a comprehensive examination of quality of service and to assess the adequacy of these standards within six months following adopt[ion] of the incentive plan.

. . . .

11. The Company will file with the Commission, and the Division will evaluate, annual intrastate revenue requirement determination[s] on both an actual and a prospective test-year basis.

12. The Division will file with the Commission the results of annual cost-of-service studies using the DCOS model. The cost-of-service studies are also to be on an actual and prospective test-year basis and to be consistent

## II. THE LAWFULNESS OF THE 12.2% RATE OF RETURN ON EQUITY

The ratepayers assert that the Commission's authorization of a 12.2% rate of return on equity is not supported by the evidence and that the Commission's own findings compel the conclusion that the 11.8% rate of return previously in effect continued to reflect the actual cost of equity capital. In support of their argument, the ratepayers rely on the Commission's findings that (1) the previously authorized rate of return of 11.8% was "sufficient to permit ... the Company to raise capital at reasonable rates"; (2) since the last USWC rate case and the last filing in the instant case, USWC's capital costs had declined; and (3) USWC had financed almost 100% of its capital needs from cash flow created by extremely "liberal rates" of depreciation and deferred taxes. The ratepayers assert that the Commission, without any basis in law or fact, increased USWC's authorized rate of return to induce USWC to make "discretionary" investments in Utah. USWC contends that there is substantial evidence to support the 12.2% rate of return and that the ratepayers have not marshaled the evidence and shown that the evidence in support of that rate of return is legally inadequate.

Two polar constitutional principles fix the parameters of rate regulation for natural monopolies: the protection of utility investors from confiscatory rates and, of equal importance, the protection of ratepayers from exploitive rates. Those principles were set out in the watershed case of *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and have been reiterated in subsequent cases, both federal and state. *E.g., Federal Power Comm'n v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 474, 93 S.Ct. 1723, 1732, 36 L.Ed.2d 426 (1973) ("[U]nder *Hope Natural Gas* rates are 'just and reasonable' only if consumer interests are protected and if the financial health of the pipeline in our

economic system remains strong...."); *Washington Gas Light Co. v. Baker*, 188 F.2d 11, 19–20 (D.C.Cir.1950) (inclusion in rate base must be just and reasonable to consumers and investors), *cert. denied*, 340 U.S. 952, 71 S.Ct. 571, 572, 95 L.Ed. 686 (1951); *Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190, 196 (1975) ("The commission can no more permit the utility to have confiscatory rates for the service it performs than it can compel a utility to provide service without just and equitable compensation."); *Mountain States Tel. & Tel. v. Department of Pub. Serv. Comm'n*, 191 Mont. 331, 624 P.2d 481, 483 (1981).

To avoid confiscatory rates on the one hand and exploitive rates on the other, the Commission must determine what a just and reasonable rate is under Utah Code Ann. § 54–4–4 by applying a standard that is based on a utility's cost of service. A cost-of-service standard mandates that rates produce enough revenue to pay a utility's operating expenses plus a reasonable return on capital invested, often referred to as the cost of capital. The cost of capital includes the cost of debt service and a return on equity capital sufficient to attract investors, given the nature of the risk of the investment. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1178 (D.C.Cir.1987); *see also* James C. Bonbright et al., *Principles of Public Utility Rates* 302–40 (2d ed. 1988). The cost of capital for utilities is generally less than the cost of capital for industrial corporations because investments in utilities are typically less risky than investments in industrial corporations.

Throughout the proceedings before the Commission and in its brief before this Court, USWC has contended that the rate of return on equity capital to which it is entitled should be the same as the rate of return its unregulated parent corporation, U.S. West, Inc., earns on its equity capital.[5] The Com-

---

with the determination of revenue requirement. The cost-of-service studies shall be performed utilizing accounting information and special studies, such as access lines and minutes of use, from the same time period.

5. The ratepayers respond to that argument in their brief:

Many of the non-telephone activities of U.S. West are unregulated entrepreneurial activities like building cable tv and fiber optic systems in

mission initially rejected that conclusion and USWC's argument that economic and technological conditions in the regulated telecommunications industry had changed so much that USWC was simply the equivalent of an unregulated industrial corporation. The Commission ruled that despite technological changes in the industry, USWC was not like "an unregulated company." The Commission stated that although

> the telecommunications industry is changing in significant ways[,] [s]uch changes have yet to disturb the essential characteristics of USWC as a regulated provider of essential services in this jurisdiction: the well known aspects of a monopoly position in the relevant market, the trust relationship between utility and consumers, and the imposed constraints upon both prices charged for services and rate of return. As conditions change, the Commission may, in future dockets, conclude otherwise.[6]

Accordingly, the Commission discounted testimony from USWC's experts with respect to the cost of equity capital because their opinions were based on the incorrect premise that investment risks in USWC were comparable to investment risks in unregulated industrial corporations.[7]

After reviewing the expert testimony presented by all parties which supported rates of return from 11.1% to 15% and considering a variety of other factors, the Commission stated, "Were this a complete summary of our conclusions, a return award at, or, more probably, *below* the current allowed return [11.8%] would be inescapable." (Emphasis added.)

In its penultimate conclusion in that part of its report fixing the rate of return on equity, the Commission stated:

> Without dispute, capital costs have declined since the previous rate of return decision of 11.8 percent, and even since the filing of direct testimony. Taken alone, this would argue for a *reduction* in allowed return.... The Commission is convinced a reduction in the current equity return, though advocated by witnesses for the Committee and the Division, would likewise be in error, given the risk implications of the changing industry and the status of the general economy in relation thereto.

(Emphasis added.) Thus, the Commission refused to reduce USWC's rate of return below 11.8%,[8] even though the Commission

---

> other countries. One of the concerns with authorizing the earnings of monopoly profits and the failure to control what is done with them, is that ratepayers will be forced to provide capital for non-regulated economic activities—a form of taxation of Utah consumers to support activities in other markets, thereby overcharging for telephone service and undercharging in the other markets.
>
> In promulgating its "incentive regulation plan" and authorizing USWC to retain significant profits beyond what the Commission found to be fair and reasonable, the Commission wholly failed to come to grips with this problem.

6. The Commission has demonstrated its sensitivity to the emergence of competitive conditions in certain areas by detariffing certain types of services.

7. For example, company witness Peter C. Cummings placed cost of equity at 14.5% to 15% on the assumption that nonregulated firms were comparable to USWC for the purpose of determining USWC's rate of return. Cummings acknowledged, however, that 11.8% had been sufficient to allow USWC to raise capital at reasonable rates, that USWC's capital requirements were internally financed, and that the capital

investment risks in USWC were less than in U.S. West, Inc. Another USWC expert witness, Dr. Roger A. Morin, rejected comparisons with the other seven regional telecommunications holding companies and instead based his comparison for establishing a rate of return on a sample composed equally of regional holding companies and *unregulated* industrial companies.

8. In refusing to reduce the rate of return below 11.8%, the Commission referred to several factors:

> The record on risk-return comparability, while not complete, on balance suggesting increasing risk; the questioned reliability of model results during unsettled moments in the economy and industry; the large, even contrary, difference in results obtained by witnesses for the Company compared with witness Compton for the Division using CAPM; the knowledge that the utility may to a degree be shedding certain utility characteristics; and the ambiguous record on expected behavior of stock price, are all influential considerations which must be evaluated in the context of a wide range of cost of equity results obtained by witness application of models. The Commission concludes there is no reason to grant an award at the upper end

had previously made allowances for the "risk implications of the changing industry and the status of the general economy in relation thereto" by allowing very liberal accelerated depreciation of USWC's assets. The Commission stated:

> In past decisions, the Commission has granted shorter asset lives and thereby increased depreciation expense. One result of this policy has been to protect the Company from the risks of technological obsolescence. Another has been to enhance the Company's positive cash flow thus enabling it to continue to expand and modernize the Utah infrastructure. The Commission finds that there is an implied relationship between its depreciation policy and its expectations for prudent and economic future investments.

After declining to reduce the rate of return for the reasons stated, the Commission *increased* the rate of return from 11.8% to 12.2% to induce USWC to make "discretionary investment decisions" favorable to Utah. The Commission did that because USWC had explicitly linked "discretionary investment aimed for the state" with the allowed rate of return.[9] The ratepayers call the "linkage" a "bribe" by the Commission to induce USWC to invest in Utah.

The Commission's own findings reveal the fallacious underpinnings of the Commission's conclusion:

> The Company repeatedly stressed that its discretionary investment decisions are driven by profitability considerations, meaning in part that economic analysis, or business case analysis, is employed to rank alternatives. Implied at times and explicit at times was the message that jurisdictional rate of return allowed by commissions could be the determining factor. The rate of return on equity in Utah is 11.8 per cent, the lowest in the 14–state USWC service territory. *The Company's witnesses labeled that rate unreasonable*

> *and made the connection between it and discretionary investment aimed for this state.*

> *It is the fact that the earned rate of return on equity, as distinct from what is allowed, in Utah is among the highest in the 14 states, and has been so in recent years.* The Company, however, argued that expected rate of return, based on allowed not past actual rate of return, is what is related to investment decisions. *Nevertheless, the Commission notes that in the recent past when the allowed rate of return in Utah was among the highest, no discernably different pattern of discretionary investment decisions affecting Utah appeared. The Commission concludes that historical evidence does not reveal a clear relationship between either allowed or earned rate of return on equity on the one hand and the amount of discretionary investment in the state on the other.*

> *Nevertheless, the Commission acknowledges the logic of the relationship between rate of return and investment decision-making. Regulation presumes a reasonable management. This is a time when states are in a sense competing for high-tech additions to and refinements of telecommunications plant and equipment. The Commission concludes that it is prudent to take these considerations into account when determining rate of return. Together, they argue for an addition to the cost of capital estimate produced by models.*

> *The Commission is concerned enough with the factors enumerated in the discussion to raise the allowed return on equity capital to 12.2 percent from the existing 11.8, and finds this return to be reasonable.*

(Emphasis added.)

The legal issue before this Court, therefore, as framed by the Commission's ruling, is whether the Commission can increase the

---

of the range, and indeed there are reasons why this would be error.

9. USWC offered the same argument in support of its incentive regulation plan, but the Commission rejected that argument on the ground that USWC had ample motive to invest in Utah, as the record

in this case amply demonstrates. After rejecting the argument in that context, it is simply extraordinary that the Commission would nonetheless increase the rate of return on the basis of the fallacious argument it had earlier rejected.

authorized rate of return on equity above a reasonable rate of return to induce a utility to make "discretionary" investments in its plant and equipment in Utah. Stated in the context of this case, the issue is whether the Commission can submit to USWC's implied threat to refrain from making appropriate investments in Utah if it is not allowed a greater return on capital than a prudent investor, given the nature of the risk of the investment, would require.

It is necessary to state emphatically that the issue is *not* whether USWC needs a higher rate of return than a fair rate of return to be able to obtain necessary capital to invest in Utah. A fair rate of return, because it is based on the market "cost of capital," *necessarily* ensures the availability of capital for investment. It is axiomatic that any time USWC wishes to resort to the capital markets of the nation, it can obtain capital at a fair rate of return to invest in Utah. In truth, the issue really is whether USWC should be given a higher rate of return than a fair return dictates to induce U.S. West, Inc., the parent corporation, to invest in USWC's operations in Utah.

■ Before turning to the merits of that issue, we address the appropriate standard of review. Although USWC argues that the issue is factual and that we must accord the Commission broad discretion,[10] the issue really is what factors may the Commission take into account in setting a rate of return.

■ The factors that the Commission may legitimately take into account in determining a rate of return are questions of law. As a general proposition, courts have ruled as a matter of law that certain factors are not includable in the *rate base*. *E.g., Utah Pow-*

er & Light Co. v. Public Serv. Comm'n, 107 Utah 155, 191–96, 152 P.2d 542, 559–61 (1944) (profits to affiliate not chargeable to ratepayers); *Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co.*, 485 N.E.2d 610 (Ind.1985) (cost of nuclear generating plant cancelled before completion not chargeable to ratepayers), *cert. denied*, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986); *Office of Consumers' Counsel v. Public Utils. Comm'n*, 1 Ohio St.3d 22, 437 N.E.2d 586, 587–88 (1982) (investment in cancelled nuclear plants not chargeable to ratepayers). The same standard of review also applies when deciding whether the Commission has relied on improper factors in determining the rate of return that is to be applied to the rate base. *See* Utah Code Ann. § 63–46b–16(4)(d) (authorizing appellate court to grant relief from agency order if the "agency has erroneously interpreted or applied the law"); *Utah Dep't of Admin. Servs. v. Public Serv. Comm'n*, 658 P.2d 601, 608 (Utah 1983); *see also Salt Lake Citizens Congress v. Mountain States Tel. & Tel. Co.*, 846 P.2d 1245 (Utah 1992) (deciding *sub silentio* that binding effect of Commission rule on nondeductibility of charitable contributions was issue of law).

In both rate-of-return and rate-base cases, the issue is what economic factors the Commission may consider in determining what rates should be charged ratepayers for the benefit of shareholders, not how much weight should be accorded any given factor. Thus, the issue is whether a given factor is a legally permissible factor to take into account, and that issue is an issue of law.

■ USWC's argument is that a utility can refuse to make necessary and appropri-

---

**10.** USWC argues that the ratepayers' attack on the 12.2% rate of return must fail because they did not marshal the evidence supporting the increased rate of return and that the rate of return is in fact supported by substantial evidence. USWC states that the Commission (1) examined a variety of results produced by different models and relied primarily on the "DCF" model (DCF stands for discounted cash flow); and (2) looked at conditions in the economy, the industry, and the fact that USWC "may to a degree be shedding certain utility characteristics"; found that the 12.2% rate of return was neither at the top of the range of 14.5% to 15%, as proposed by

USWC's witnesses, or at the bottom of the range, as proposed by other witnesses, i.e., from 11.1% to 11.6%. USWC concludes that there is voluminous evidence in the record that supports various rates of return and that the rate established by the Commission falls within the range of the expert evidence on that point.

The difficulty with USWC's position is that it fails to acknowledge that the *Commission* assessed the weight to be given all those factors when it decided that the 11.8% rate of return should not be lowered. The Commission's ruling on that point is not contested.

ate investments for the public convenience and necessity unless the utility is paid more than a reasonable rate of return. That position is flatly irreconcilable with a utility's legal duties under the laws of the state of Utah and with the Commission's duties to require a utility to do all that is necessary to serve the public convenience and necessity in return for a fair and just rate of return. *See* Utah Code Ann. §§ 54–4–1, –4, –7, –8.

To prevent a utility from using its monopoly power to charge exploitive rates, the Legislature has provided that a utility may charge only those rates found to be just and reasonable by the Public Service Commission. Utah Code Ann. § 54–4–4. Just and reasonable rates are necessarily based on cost of service and cost of capital, whatever the particular formula used.[11] The Legislature has provided that just and reasonable rates for telecommunications utilities are those based on cost of service. Utah Code Ann. §§ 54–8b–3.2, –3.3, –11.

■■■■■ A rate based on cost of service means a rate sufficient to pay operating costs plus the cost of a fair return to investors for providing capital, both equity and debt. *See Utah Dep't of Business Regulation v. Public Serv. Comm'n*, 614 P.2d 1242 (Utah 1980); *see also Utah Power & Light Co. v. Public Serv. Comm'n*, 107 Utah 155, 212, 152 P.2d 542, 568 (1944) (citing *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 692, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923)). A fair return on capital means a rate of return, given the nature of the investment risk, sufficient to attract capital for investment. As stated in *Utah Power & Light Co.*:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no con-

stitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." 152 P.2d at 568 (quoting *Bluefield Water Works*, 262 U.S. at 692, 43 S.Ct. at 679).

USWC is a multi-state utility and a wholly owned subsidiary of a large industrial company. It has used those features to coerce a higher rate of return from the Commission by threatening to divert investment funds from Utah to other states and to the more profitable, but more risky, investments that the unregulated parent company can make.

A utility's effort to obtain a higher rate of return by using the existence of more profitable alternative investment possibilities as a reason for not making appropriate investments in Utah is utterly inconsistent with a utility's legal obligations. USWC has a legal duty, as do all utilities, to make all investments necessary and appropriate to maintain and modernize its plant and equipment. The Commission may order, and in this case has ordered, improvements and modernization of USWC's plant and equipment, and that duty is implicit in the statutory scheme. That order is enforceable by the Commission under the statutes of this state. *See* Utah Code Ann. §§ 54–3–23, 54–7–24, 54–7–25, 54–7–26; *see also Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975) (affirming commission order directing utility to reduce rates retroactively because of inadequacy of its service).

For the Commission to grant USWC an increased rate of return to induce it to invest in Utah rather than in some other state or in the more risky investments its parent might make is to subvert the statutory scheme designed to prevent utilities from using their monopoly power to extract exploitive rates from consumers. The Commission recog-

---

11. Various industries use different formulae that recognize differences in the economic and competitive conditions of an industry that is not a natural monopoly. Motor carriers, for example, use operating ratios as a means for fixing rates. All formulas, however, give recognition to concepts of cost.

nized as much when, in rejecting USWC's incentive regulation plan, it specifically rejected USWC's position that it had insufficient incentive to invest in Utah. In that connection, the Commission ruled, contrary to its ruling on rate of return, that allowing USWC the "market cost of capital" provided "an appropriate long-term basis upon which investment decisions should be made by the Company":

*It appears that the essence of this [USWC's] argument is that the Company is discouraged from investing in activities and jurisdictions where the return is not as high as other jurisdictions or business opportunities. In fact, Company witnesses asserted on the record that all the Company is really after is a higher return on its investment. The Commission finds that a commitment by the Company to the provision of public service and an opportunity to earn the allowed rate of return equal to the market cost of capital, as determined by this Commission, provides an appropriate long-term basis upon which investment decisions should be made by the Company.*

(Emphasis added.)

If the Commission's position with respect to the effect it can give to the profitability of alternative investments in determining rate of return were to stand, USWC could play off the Utah Public Service Commission against other state regulatory commissions. Each commission would have to bid against the other and offer ever higher rates of return to induce USWC to invest in that state. Alternatively, USWC could require the Commission to grant a rate of return equal to the riskiest of U.S. West, Inc.'s investments. For the Commission to yield to such threats is to detach the concept of the cost of capital in rate-making from any meaningful standard and to leave ratepayers subject to whatever exploitive rates a utility might be able to leverage from a compliant regulatory commission.

Ironically, the Commission specifically rejected USWC's argument at a different point in its opinion when it denied USWC's motion to stay the Commission's order directing USWC to modernize its facilities. On its motion for a stay, USWC was unabashedly explicit that a "regulated utility return" was not acceptable to it because U.S. West, Inc., its parent (the source of USWC's equity capital), could obtain a greater return on its investments elsewhere. USWC stated:

The Commission has stated that it will allow a reasonable return to be earned on these investments and that, therefore, they are without risk. Such an approach fails to recognize that USWC and its parent U.S. West, Inc., as managers of the capital on behalf of investors have a variety of options as to the use and deployment of capital. Among these options are the use of capital in projects with a greater return potential than a regulated utility return. *Thus, the fact that USWC may be given the opportunity to earn a regulated utility return does not obviate the myriad other potential investment opportunities.*

(Emphasis added.)

The Commission quite properly rejected the extraordinary impropriety of the argument in that context, even though it had yielded to that argument when it increased USWC's rate of return to 12.2%. In denying the stay, the Commission rejected USWC's argument and even suggested that USWC had not acted in good faith in failing to make investments contemplated by the Commission's accelerated depreciation policies. The Commission stated:

While this statement is made in the context of a request for a stay of our order, nonetheless, *it seems to reflect USWC's present attitude towards utility investments generally. In our judgment this attitude stands traditional regulation on its head. It is apparently the Company's view that utility investment is simply one among many investment opportunities. While it used to be that for a monopoly provider a public service obligation was paramount, now, in Mr. Fuehr's [USWC's witness] view, the provider is free to play one investment option against another, including utility investment. The Commission is therefore put in the position of having to bid, literally, against other nonutility investment options, real or imagined, in order to insure that utility invest-*

*ments required for service adequacy are made.*

. . . .

Mr. Fuehr's statement is further flawed by the fact that it assumes that USWC has very limited access to financial resources and the required Utah utility investments would displace much more profitable investment opportunities elsewhere. There is absolutely no evidence on the record to show that USWC cannot go to the financial markets at any time and obtain the capital it desires on highly favorable terms.

In addition, it is an established and well-known fact that utility investments are relatively safe, low-risk and dependable. Nonetheless, Mr. Fuehr's statement would require that we assume that these other supposedly more lucrative investments are equally low-risk, safe and dependable. In establishing the allowed return on investment, we fully consider risk, guided by the need for risk-return parity. Mr. Fuehr fails to note that the non-utility investments the Company may make will offer higher return only if greater risk is assumed.

*Nor does the USWC argument take into account the accelerated depreciation which the Company has enjoyed on its investments in utility service over the past five years. The accelerated depreciation was intended to make new utility investment more attractive to USWC but the investments haven't been made even though the Company has had the benefit of the increased revenues from the depreciation.*

(Emphasis added.)

Clearly, the Commission's task of protecting the public interest is significantly more difficult when a utility is a wholly owned subsidiary of an unregulated industrial giant. Those facts, however, emphasize the need for closer scrutiny of the extent to which such a utility complies with its legal obligations to provide appropriate plant, equipment, and service at rates no higher than required by the cost of operations and the market cost of capital. It is a clear abuse of sound economic principles, to say nothing of fairness to ratepayers, to seek to charge the higher rates that would be necessary for more risky,

unregulated enterprises or that would be required to meet rates in other jurisdictions where efficiency factors and other cost-of-service considerations are different.

In short, the ratepayers in this case are correct in asserting that the governing standard in determining the rate of return on equity is the cost of inducing capital markets to invest in USWC, not the cost of inducing USWC to invest in Utah. Accordingly, we hold that the Commission's order fixing the rate of return on equity at 12.2% is unlawful, and we remand this case to the Commission to enter an order fixing a lawful rate of return consistent with this opinion.

That does not, however, conclude this issue. The Commission's own admissions as to USWC's actual rates of return raise the most serious and fundamental questions concerning the Commission's nonperformance of its legal duties. In its order denying USWC's motion for a stay, the Commission made the stunning admission that USWC's rates would likely produce a rate of return approximating *17%,* not the *12.2%* fixed by the Commission. The Commission stated:

> Furthermore, we do not believe that the loss of allegedly more lucrative opportunities is a justification for a stay given the history of USWC's overearnings in Utah over the past five or six years. *The Company has earned nearly 17% annually on its Utah investments over that period of time and we doubt very much that actual returns in the near future will be significantly lower. It is worth noting that in each of its rate cases for some years now the Company has projected a relatively dismal return on its investment and the actual return has been well above that authorized by this Commission.* Therefore, the likelihood that the Company will lose substantial revenues by making a relatively modest investment in Utah as opposed to its "pie-in-the-sky" investments elsewhere is minimal.

(Emphasis added.)

The astonishing and perplexing indication that the Commission expected USWC to actually earn nearly 17%, approximately 40% more than the authorized rate of return,

suggests a serious breakdown in the Commission's regulation of USWC's rates. Equally troubling is USWC's record of overearnings that goes far back in time. The history of USWC's unprecedented overearnings for a number of years indicates an extraordinary abdication by the Commission of its statutory duties. The Commission itself has admitted that USWC has earned *"nearly 17% annually on its Utah investments"* over the past five or six years.[12] That is approximately 45% more than USWC's authorized rate of return and amounts to many tens of millions of dollars collected from ratepayers in excess of a fair return. Notwithstanding that history, the Commission was apparently content to continue allowing exorbitant earnings even after the Order in this case, as indicated by its admission that "we [the Commission] doubt very much that actual returns in the near future will be significantly lower" than the historical *actual* returns of "nearly 17%." We are at a loss to understand how the Commission could have fixed a 12.2% rate of return and then expect USWC's *actual* rate of return to approximate 17% "in the near future."

The record in this case and the history of prior proceedings give rise to grave concerns about the integrity of the Commission's regulation of USWC's rates and practices and why the regulatory process has been abused "for some years now" by a company that has repeatedly "projected a relatively dismal return on its investment," as the Commission itself has acknowledged. Whether USWC has, in fact, collected profits since the Commission entered its Report and Order in this case that approximate a 17% rate of return, and if so, whether the excess earnings should be credited to the benefit of ratepayers, is not presently before us but might well be a matter that will come before the Commission on remand. *See New England Tel. & Tel. Co. v. FCC,* 826 F.2d 1101 (D.C.Cir.1987) (holding that where utility earns higher rate of return than rate prescribed by regulatory commission, rule against retroactive ratemaking does not bar order requiring excess revenues to be credited to ratepayers in certain circumstances), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989); *see also MCI Telecoms. Corp. v. Public Serv. Comm'n,* 840 P.2d 765, 775 (Utah 1992).

## III. THE CONSTITUTIONALITY OF UTAH CODE ANN. § 54–4–4.1

After the Commission rejected USWC's proposed incentive regulation plan, the Com-

---

**12.** For a number of years, USWC has been allowed to earn profits far in excess of its authorized rate of return. *See generally MCI Telecoms. Corp. v. Public Serv. Comm'n,* 840 P.2d 765 (Utah 1992). One witness in this case stated that between 1987 and 1990, USWC exceeded the authorized rate of return by some $91 million.

The history of the regulation of USWC's earnings is replete with the Commission's constantly ordering rate reductions that were too small to rectify USWC's persistent overearnings. As a result, rates consistently have produced exorbitant profits. In December 1987, the Commission ordered a *prospective* reduction in USWC's rates of $9 million based on USWC's projection of the effect of the Tax Reform Act of 1986. *See id.* at 768. That projection was woefully and inexplicably in error, especially in light of the fact that other utilities did not err in the same manner. Pursuant to Commission directives a few months later, USWC reduced its rates *prospectively* another $16 million effective September 22, 1988, and then by an additional $10 million effective January 1, 1989. *Id.* at 769. In an order issued October 18, 1989, docket No. 88–049–07, the Commission ordered another *prospective* reduction of USWC's revenues by almost $22 million. *Id.*

The Commission found that in 1988, U.S. West, Inc., had earned a return on equity of 14.9%, the highest in the company's history. *In re Mountain States Tel. & Tel.,* docket No. 88–049–07, Report and Order issued October 18, 1989, at 69. Its Utah operations earned 16.2% in 1988. *Id.* The Commission ordered a further *prospective* reduction of $10,711,000 on June 22, 1990, and another such reduction of $8,238,000 on January 1, 1991. Six months later, the Commission entered its order in the instant case requiring USWC to reduce its *future* revenues by still another $19,799,000, even though the Commission had increased the rate of return from 11.8% to 12.2%.

Since 1988, the Commission has entered a total of seven rate reductions, only two of which were based on findings of fact. All the rest were done by stipulation. In no case has the Commission explained the cause of the persistent overearnings. Because rates have been reduced *prospectively* on a step-by-step basis, the Commission has made it possible for USWC to capture and retain excessive profits far beyond those authorized by law.

mission devised an incentive regulation plan of its own. *See* Utah Code Ann. § 54–4–4.1(1). USWC vetoed the Commission's plan pursuant to Utah Code Ann. § 54–4–4.1(2). The ratepayers assert that § 54–4–4.1(2) is unconstitutional because it illegally delegates legislative and judicial power to a private party. Section 54–4–4.1(2) provides:

> Not later than 60 days from the entry of an order or adoption of a rule adopting a method of rate regulation whereby revenues or earnings of a public utility above a specified level are equitably shared between the public utility and its customers, the public utility may elect not to proceed with a method of rate regulation by filing with the commission a notice that it does not intend to proceed with the method of rate regulation.

■ USWC argues that the constitutionality of the veto under § 54–4–4.1(2) is a moot issue because "no plan of any kind is now in effect under the powers granted to the Commission by Section 54–4–4.1" and an opinion as to the constitutionality of that subsection would constitute an advisory opinion which this Court may not give. *See Black v. Alpha Fin. Corp.*, 656 P.2d 409, 410–11 (Utah 1982); *Merhish v. H.A. Folsom & Assocs.*, 646 P.2d 731, 732 (Utah 1982); *State v. Kallas*, 97 Utah 492, 504, 94 P.2d 414, 424 (1939).

Even if USWC's position were factually correct, and it is not, the argument is not valid. Mootness is not a doctrine that forever insulates a legal issue from adjudication. Under USWC's argument, the constitutionality of the veto provision could never be addressed. If an incentive regulation plan were adopted by the Commission and a utility did not veto it, the validity of the veto provision clearly could not be raised. On the other hand, when an incentive regulation plan is adopted and a utility vetoes it, as here, the constitutionality of the statute authorizing the veto is clearly not a moot issue.

USWC's argument is based more on the ground that no party before the Court now argues that the plan the Commission promulgated is lawful and binding, although the ratepayers affirmatively assert that the plan is unlawful and would be unconstitutional, if otherwise lawful. USWC does not support the lawfulness of the plan as such, but contends that incentive plans are constitutional even if wholly detached from cost-of-service factors, as long as the utility can veto such a plan. Justice Howe's dissenting opinion agrees with USWC's position that the issue is moot because no one argues that the Commission's plan should be in effect.

However, the fact that no party on this appeal argues that the plan should be in effect is not dispositive. The Commission has not confessed error as to the lawfulness of its plan. USWC's veto is the only reason the Commission's plan is not now in effect. The Commission's incentive plan is presumptively valid and in effect if its veto by USWC is unlawful and it meets other legal requirements. Clearly, the issue of the constitutionality of § 54–4–4.1(2)'s granting a veto power to a private party has been joined and argued by both the ratepayers and USWC. The issue is not moot.[13]

■ In promulgating its incentive regulation plan, the Commission exercised a legislative power delegated to it by the Legislature, and in nullifying that order, USWC, a private party, exercised a legislative power. The Constitution confers only one kind of veto power over legislative acts, and that is the power conferred by the Constitution on the executive branch as a check and balance on legislative power. The Constitution does not confer a power on private parties to veto legislative acts. Nevertheless, § 54–4–4.1(2) purports not only to confer a veto power on a utility over a quasi-legislative act of the Commission, but it does so without establishing any standards governing its exercise. Thus,

---

13. Whether the Commission's plan is supported by a party on this appeal is irrelevant to the issue of whether the constitutionality of the veto provision is moot. The Commission's plan is at least presumptively lawful and binding if the power to veto is unconstitutional and if the order meets other legal requirements. Indeed, USWC vigorously argues that Utah Code Ann. § 54–4–4.1(1),

the provision authorizing incentive rate regulation, is constitutional, and at least to that extent, USWC supports the Commission's plan as a matter of general principle. The ratepayers argue just as vigorously that § 54–4–4.1(1) is unconstitutional. The veto issue, therefore, is presented in the requisite adversarial context.

USWC could, and apparently did, veto the Commission's incentive plan for the sole purpose of advancing its own interest, not the public interest.

In several cases, this Court has held that the Legislature cannot constitutionally delegate to private parties governmental power that can be used to further private interests contrary to the public interest. In *Revne v. Trade Commission*, 113 Utah 155, 192 P.2d 563 (1948), this Court held unconstitutional a statute authorizing 70% of the barbers in a geographic area to adopt prices and hours of operation for submission to a state board of barbers appointed by the governor. The board delegated the power to approve the prices and working hours proposed by the barbers, but the board did not have the power to initiate a proceeding to set prices and hours. In holding the legislative delegation of the power to initiate such proposals unconstitutional, the Court stated that the public interest was given "second place to the interest of a 70% majority of the profession directly affected by the law." *Id.* at 163–64, 192 P.2d at 567. The Court explained:

> If, then, the question as to whether or not a given locality shall have such law promulgated or, modified, or rescinded if already in existence, is left to the whim of this group, it is hard to escape the conclusion that legislative authority has been improperly delegated or surrendered to that class.

*Id.* at 164, 192 P.2d at 568. In a concurring opinion, Justice Latimer stated that the statute "vests the operation and control of the law in a group of individuals who are directly interested in the economical features of the act." *Id.* at 169, 192 P.2d at 570 (Latimer, J., concurring).

*Union Trust Co. v. Simmons*, 116 Utah 422, 211 P.2d 190 (1949), is to the same effect. In *Union Trust*, a statute regulating the establishment of branch banks prohibited the bank commissioner from approving the establishment of such a bank unless competing banks in the community gave the commissioner written consent to consider the application. In essence, competing banks held a veto power over the bank commissioner's acts. The Court held the law unconstitu-

tional because it delegated legislative power to a private party:

> [T]he operation of the law is not contingent primarily upon the determination of public convenience and advantage by proper administrative authority, but is primarily contingent upon the whim and caprice of competitors whose interests obviously are opposed to additional competition.

116 Utah at 427, 211 P.2d at 192; *see also Salt Lake City v. International Ass'n of Firefighters*, 563 P.2d 786, 789 (Utah 1977) (legislature may not delegate legislative authority to private group whose interests may be antagonistic to public interest); *Southern Pac. Transp. Co. v. Public Util. Comm'n*, 18 Cal.3d 308, 134 Cal.Rptr. 189, 192, 556 P.2d 289, 292 (1976) ("The Legislature may not confer upon private persons unrestricted authority to make administrative determinations."). *See generally I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (one house of Congress could not exercise a veto power over an order of an administrative agency); *Consumers Union of U.S., Inc. v. F.T.C.*, 691 F.2d 575 (D.C.Cir.1982) (congressional veto power over FTC rule making violated separation of powers and Article I procedure for exercise of legislative powers), *aff'd sub nom. Process Gas Consumer's Group v. Consumer Energy Counsel of Am.*, 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403 (1983). For the foregoing reasons, we hold that § 54–4–4.1(2) is unconstitutional.

In the instant case, the role of the Commission is to protect the interests of both the ratepayers and the shareholders and to accommodate both those interests to the overall public interest. The veto power granted by the statute to a utility is a power that can be used to advance only the shareholders' interests, without regard to either the ratepayers' interests or the overall public interest. In addition, the statute sets out no guidelines that even purport to limit the utility's exercise of the veto power; the delegation of legislative power is not only to a private party, but it is also wholly without standards. Under *Revne, Union Trust,* and

*Salt Lake City,* we hold § 54–4–4.1(2) unconstitutional.

USWC contends, however, that even apart from the statute it has a *constitutional* right to veto a revenue sharing plan. USWC argues that § 54–4–4.1(2) in effect codifies the rule against retroactive rate-making and that the rule is constitutionally based. According to USWC, a revenue sharing plan can be valid only if a utility voluntarily waives its constitutional right to prohibit retroactive rate-making and retroactive rate-making occurs under the Commission's plan because it does not allow USWC to retain all profits in excess of USWC's authorized rate of return.

In essence, USWC's argument is that it has a constitutional right to all revenues it collects, even if they exceed the authorized rate of return, however large the excess, and even if the Commission's order or a statute were to prohibit that result in whole or in part.

USWC cites no case, and we are aware of none, that holds or even suggests that a utility has a constitutional right to retain all earnings in excess of a reasonable rate of return or that allows a utility to nullify a revenue sharing plan that prospectively allows ratepayers to share in excess earnings. USWC's argument is based solely on general language, usually dicta, found in some opinions from other courts to the effect that the general rule against retroactive rate-making is constitutionally based. *See, e.g., South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n,* 594 So.2d 357, 359 (La.1992); *General Tel. Co. v. Michigan Pub. Serv. Comm'n,* 78 Mich.App. 528, 260 N.W.2d 874, 876 (1977); *Straube v. Bowling Green Gas Co.,* 360 Mo. 132, 227 S.W.2d 666, 671 (1950);

*Texas Ass'n of Long Distance Tel. Cos. v. Public Util. Comm'n,* 798 S.W.2d 875, 881–82 (Tex.Ct.App.1990); *In re Central Vermont Pub. Serv. Corp.,* 144 Vt. 46, 473 A.2d 1155, 1158 (1984).

On the other hand, there are cases suggesting that the rule is not constitutionally based. *See Elizabethtown Water Co. v. New Jersey Bd. of Pub. Util.,* 107 N.J. 440, 527 A.2d 354, 364 (1987) (it is within purview of legislature to grant board of public utilities general retroactive rate-making power); *Narragansett Elec. Co. v. Burke,* 505 A.2d 1147, 1148–49 (R.I.1986) (public utilities commission had statutory authority to order refund of rates earned in excess of authorized rate of return; utility did not have vested right to earnings above authorized rate of return); *In re Central Vermont Pub. Serv. Corp.,* 144 Vt. 46, 473 A.2d 1155, 1160 (1984) (requiring consumers to pay past deficits of utility or utility to refund previously earned excess profits to consumers is illegal *unless authorized by statute).*[14]

■ We hold that the rule against retroactive rate-making is not constitutionally mandated. Rather, that rule is based on sound rate-making policies, not constitutional in nature, and is subject to a number of limitations and exceptions. Indeed, if the rule against retroactive rate-making were constitutional in nature, as USWC argues, its application could have devastating financial consequences for utilities because, as seen below, it would bar utilities from ever charging ratepayers for any part of overwhelming expenses occasioned by unforeseeable and extraordinary circumstances. *See MCI Telecoms. Corp. v. Public Serv. Comm'n,* 840 P.2d 765, 771–74 (Utah 1992).

---

**14.** The proposition that the rule against retroactive rate-making is constitutionally based is also inconsistent with a number of cases holding that utilities can recover extraordinary costs arising from unusually severe storms. *E.g., Narragansett Elec. Co. v. Burke,* 415 A.2d 177 (R.I.1980); *Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n,* 98 Wis.2d 682, 298 N.W.2d 205, 212 (Ct.App.1980); *Re Kansas City Power & Light Co.,* 55 Pub.Util.Rep. 4th (PUR) 1, 38–41 (Mo. Pub.Serv.Comm'n 1986); *see Re United Illuminating Co.,* 7 Pub.Util.Rep.4th (PUR) 417, 435 (Conn.Pub.Util.Comm'n 1974); *Re Diamond State Tel. Co.,* 28 Pub.Util.Rep.3d (PUR) 121,

137–38 (Del.Pub.Serv.Comm'n 1959); *Re Kansas Power & Light Co.,* 8 Pub.Util.Rep.4th (PUR) 337, 352–53 (Kan. State C.C. 1975); *Re Detroit Edison Co.,* 20 Pub.Util.Rep.4th (PUR) 1, 34 (Mich.Pub. Serv.Comm'n 1977); *Re Chrisp's Tel. Co.,* 65 Pub.Util.Rep.3d (PUR) 317, 319–20 (Neb. State R.R. Comm'n 1966); *Re Long Beach Water Co.,* 53 Pub.Util.Rep.3d (PUR) 495, 498–99 (N.J.Pub. Util.Comm'n 1964); *Re Long Island Lighting Co.,* 9 Pub.Util.Rep.4th (PUR) 21, 35 (N.Y.Pub.Serv. Comm'n 1975); *Pennsylvania Pub. Util. Comm'n v. Pennsylvania Elec. Co.,* 25 Pub.Util.Rep.4th (PUR) 342, 357–58 (Penn.Pub.Util.Comm'n 1978).

■ The leading case in this state on the rule against retroactive rate-making is *Utah Department of Business Regulation v. Public Service Commission*, 720 P.2d 420 (Utah 1986) (the *EBA* case), which held that the rule against retroactive rate-making barred adjustments to increase rates charged ratepayers by means of an "energy balancing account." The Court stated that the policy underlying the rule is "to provide utilities with some incentive to operate efficiently." *Id.* at 420. The essence of the rule was stated to be that utilities

> are generally not permitted to adjust their rates retroactively to compensate for unanticipated costs or unrealized revenues. This process places both the utility and the consumers at risk that the rate-making procedures have not accurately predicted costs and revenues. If the utility underestimates its costs or overestimates revenues, the utility makes less money. By the same token, if a utility's revenues exceed expectations or if costs are below predictions, the utility keeps the excess.

*Id.* at 420–21 (citations omitted). Accordingly, "[t]he bar on retroactive rate-making has no exception for missteps made in the rate-making process," even though the projections of expenses and revenues for the test year vary from actual experience. *Id.* at 424.

As a general proposition, adjustments made in future rates to compensate for *errors* in prior rate-making proceedings are deemed retroactive in nature, and such adjustments are generally not consistent with a statutory regulatory scheme based on prospective rate-making. Nevertheless, the adjustment of *future* rates to take into account past events is not technically a *retroactive* process at all. In truth, the rates are set on a wholly prospective basis. Indeed, the *EBA* case recognized that fact when it stated, "Overestimates and underestimates are then taken into account at the next general rate proceeding in an attempt to arrive at a just and reasonable future rate." *Id.* at 421.

Consistent with the nonconstitutional basis of the rule against retroactive rate-making, this Court has recognized certain exceptions to the general rule. In *MCI Telecommunications Corp. v. Public Service Commission*, 840 P.2d 765, 771 (Utah 1992), the Court stated that the general rule was a sound rate-making principle, but that it only applies to " 'missteps in the rate-making process.' It does not apply where justice and equity require that adjustments be made for unforeseen windfalls or disasters not caused by the utility." *Id.* at 772. *MCI* held that when an unforeseeable event results in an "extraordinary increase or decrease in expenses or revenues," the rule against retroactive rate-making does not bar an adjustment in utility rates to take into account such extraordinary overearnings or underearnings. *Id.* at 771–72. Because earnings or expenses caused by an unforeseeable event cannot be reasonably anticipated in the rate-making process, justice and equity may require appropriate adjustments in future rates to offset extraordinary financial consequences. Thus, adjustments to future rates to offset missteps in the rate-making process based on the inability to predict revenues and expenses accurately are not permitted, but

> [t]he extraordinary and unforeseeable nature of the expenses recognized under the exception differentiates them from expenses inaccurately estimated because of a misstep in the rate-making process, such as the inability to predict precisely, or from mismanagement. An increase or decrease in expenses that is unforeseeable at the time of a rate-making proceeding cannot, by hypothesis, be taken into account in fixing just and reasonable rates. Furthermore, because the increase or decrease must have an extraordinary effect on the utility's earnings, the increase or decrease will necessarily be outside the normal range of variance that occurs in projecting future expenses.

*Id.*

■ We note parenthetically that the exception to the rule does not relieve investors of the inherent investment risks they assume in investing capital. *See Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1190–91 (D.C.Cir.1987) (Starr, J., concurring). Thus, the exceptions to the rule against retroactive rate-making do not guarantee investors against all losses.

Another exception to the rule against retroactive rate-making was recognized in *Salt Lake Citizens Congress v. Mountain States Telephone & Telegraph Co.,* 846 P.2d 1245, 1254 (Utah 1992). There, the Court held that the general rule does not apply if a utility's conduct undermines the integrity of the rate-making process. *See also MCI Telecoms. Corp. v. Public Serv. Comm'n,* 840 P.2d 765, 775 (Utah 1992); *New England Tel. & Tel. Co. v. FCC,* 826 F.2d 1101 (D.C.Cir.1987), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989).

None of our cases alludes to a constitutional basis for the rule against retroactive rate-making. In each case, the Court was concerned solely with applying sound rate-making principles in light of fairness to both ratepayers and shareholders. The core justification for the rule against retroactive rate-making is to give a degree of reliability and predictability to the inherently imprecise process of fixing rates. Advantages that may temporarily inure to the benefit of either ratepayers or investors because of the inherent inexactitude in rate-making proceedings should even out in the long run. The rule also simplifies the rate-making process by precluding the constant reexamination of prior rate-making proceedings. To some extent, the rule provides benefits similar to those provided by the doctrine of res judicata, although that analogy cannot be pushed too far.

Thus, the rule against retroactive rate-making is not absolute and does not rest on a constitutional right of a utility to earnings in excess of what is just and reasonable any more than the rule gives ratepayers a constitutional right to service at rates that are less than just and reasonable.

In sum, Utah Code Ann. § 54–4–4.1(2) is an unconstitutional delegation of a legislative power.

## IV. SEVERABILITY OF UTAH CODE ANN. § 54–4–4.1(1) AND (2)

■ Having held the veto provision in subsection (2) of § 54–4–4.1 unconstitutional, we come now to the ratepayers' argument that subsection (1) of § 54–4–4.1 must also be held unconstitutional because the two subsections are integrally related.

Because the nature of the relationship between the two provisions is critical to the inquiry at hand, we set out the two subsections of § 54–4–4.1:

(1) The commission may, by rule or order, adopt any method of rate regulation consistent with this title, including a method whereby revenues or earnings of a public utility above a specified level are equitably shared between the public utility and its customers.

(2) Not later than 60 days from the entry of an order or adoption of a rule adopting a method of rate regulation whereby revenues or earnings of a public utility above a specified level are equitably shared between the public utility and its customers, the public utility may elect not to proceed with the method of rate regulation by filing with the commission a notice that it does not intend to proceed with the method of rate regulation.

■ Whether a part of a statute that is held unconstitutional is severable from the remainder of the statute depends on legislative intent. Where that intent is not expressly stated, a court will infer the probable legislative intent from the relationship of the unconstitutional provision to the remaining sections of the statute by determining whether the remaining sections, standing alone, will further the legislative purpose.

The general principle was stated in *Union Trust Co. v. Simmons,* 116 Utah 422, 211 P.2d 190 (1949):

Severability or separability where part of a statute is unconstitutional, is primarily a matter of legislative intent. The test fundamentally is whether the legislature would have passed the statute without the objectionable part, and whether or not the parts are so dependent upon each other that the court should conclude the intention was that the statute be effective only in its entirety. Frequently the courts are aided in the determination of legislative intent by the inclusion within a statute of a "saving clause."

*Id.* at 429, 211 P.2d at 193 (citation omitted); *see also Salt Lake City v. International Ass'n of Firefighters,* 563 P.2d 786, 791 (Utah 1977). In the instant case, there is no savings clause.

We hold that subsection (1) is severable from subsection (2). The invalidation of subsection (2) has no necessary legal or practical effect upon the operation of subsection (1). The invalidation of subsection (2) does not frustrate the legislative purpose embodied in subsection (1). Subsection (1) is not, therefore, invalid under the doctrine of severability.

## V. LAWFULNESS OF THE COMMISSION'S RATE REGULATION PLAN UNDER UTAH CODE ANN. § 54-4-4.1(1)

The ratepayers contend that § 54-4-4.1(1) is unconstitutional because it provides no substantive standards for guiding the Commission in fixing a utility's rates or rate of return so that the fixing of a rate of return is subject only to the unbounded discretion of the Commission. In the alternative, the ratepayers argue that the Commission must apply cost-of-service standards to avoid adopting tariffs or rates of return that are exploitive as to the ratepayers.

USWC asserts that no particular method or formula of rate-making is required as long as rates are established pursuant to procedural due process requirements and are not confiscatory of shareholder interests. USWC argues that ratepayers' interests need not be protected under that provision, except that ratepayers should not be charged exploitive rates. USWC does not define the term "exploitive rates." Thus, USWC sees no effective limitation on the rates it could charge under that provision. USWC asserts that *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and *Utah Power & Light Co. v. Public Service Commission,* 107 Utah 155, 152 P.2d 542 (1944), require only that

rates not be confiscatory of shareholder investments. In sum, USWC contends that there are no substantive standards that the statute imposes on either rates charged or rates of return.

■ We do not reach the question of whether § 54-4-4.1(1) would be constitutional if it were read to be devoid of all substantive standards that would protect ratepayers' interests as USWC reads it. In our view, § 54-4-4.1(1) cannot be so read.

Section 54-4-4.1(1) grants the Commission authority to adopt "any method of rate regulation" which is *"consistent with"* Title 54 of the Public Utilities Act. (Emphasis added.) Title 54 makes abundantly clear that all rates of a public utility must be "just and reasonable." Utah Code Ann. § 54-3-1, § 54-4-4, § 54-4a-6(4).[15] Section 54-8b-11 requires the Commission in administering Title 54 to endeavor "to make available high-quality, universal telecommunications service at just and reasonable rates for all classes of customers," and § 54-8b-3.3(1) specifically provides for "cost-based" regulation at least with respect to certain aspects of telecommunications service:

(1) As used in this section, "cost-based" means that the prices for the telecommunications services shall be established after taking into consideration the cost of providing the service. The term "cost-based" does not prevent the establishment of prices that promote the universal availability of service in the state.

Thus, the term "just and reasonable rates" as used in Title 54, and particularly as used in § 54-8b-11, has reference to "cost-based" rates, meaning rates sufficient to cover all necessary costs of operation and the cost of capital. USWC's argument that the Commission has unfettered discretion in setting rates except for rates that are confiscatory ignores the statutory language.

■ We turn now to the legality of the plan promulgated by the Commission under

**15.** To guide the Division of Public Utilities in its activities, the Legislature provided that the term "just, reasonable, and adequate" should include, but not be limited to, a number of criteria, including the provision of "adequate levels of ser-

vice at the lowest cost consistent with ... other provisions" and a "fair apportionment of the total cost of service among customer categories and individual customers." § 54-4a-6(4)(c), (d).

§ 54–4–4.1(1). The Commission made no findings in support of the percentage breakdowns that determine the sharing of revenues between the utility and the ratepayers. Revenue sharing begins at a rate of return of 12.2%, the rate the Commission erroneously found to be just and reasonable based on cost-of-service standards. Under the plan, USWC retains 20% of all overearnings between 12.2% and 13.2%; 40% of all overearnings between 13.2% and 14.2%; and 50% of all overearnings between 14.2% and 17%. Earnings in excess of 17% were to be returned to the ratepayers. Thus, notwithstanding the 12.2% authorized rate of return fixed by the Commission, USWC has an incentive to earn up to a 17% rate of return.

The Commission's order is defective for a number of reasons. First, it was entered without notice to any party or a hearing on the merits of the plan. Second, the plan essentially forsakes cost-of-service principles as required by Title 54 of the Public Utilities Code. The sharing of revenue begins at 12.2%, but all earnings over and above that percentage that USWC can retain are necessarily excessive because they are not justified by any cost-of-service principle. Nor can they be justified on the ground that they provide an "incentive" for USWC to invest in Utah. That point has been discussed at length above. In fact, the incentive to earn higher profits can be achieved as easily, or more easily, by false economics such as cutting maintenance expenses, reducing customer services, and deferring necessary investments. On that score, we emphatically note that the Commission has allowed USWC accelerated depreciation rates to induce USWC to invest in Utah and USWC has not made the investments contemplated.[16] Unjustifiable accelerated depreciation rates translate into unjustifiable charges against ratepayers that inure to the benefit of the shareholders.

Nor can the Commission's plan be justified on the ground that it enables ratepayers to share in some of USWC's excess earnings. Given the Commission's extraordinary default in the regulation of USWC's earnings over the past years, that might well seem a desirable objective, but it is hardly a rationale for institutionalizing and legalizing exorbitant rates. Even if it is possible to justify a sharing of earnings in excess of an authorized rate of return because of a necessary and inevitable lag in rate-fixing procedures, it is certainly not justifiable for a utility to retain excess earnings in increasingly larger percentages above the authorized rate of return on equity. Finally, the Commission's plan in effect assumes that another rate-making proceeding need not take place unless and until USWC earns in excess of 17%, a prescription for regulatory neglect and exploitive rates.

For all the above reasons, the Commission's incentive plan is arbitrary, capricious, and unlawful.

## VI. ATTORNEY FEES

■■■ The ratepayers argue that they are entitled to attorney fees. USWC contends that the issue of attorney fees should not be addressed by this Court because it was not presented to the Commission and that, in any event, there is no basis for awarding attorney fees.

■■■ We address first the procedural issue raised by USWC—that the ratepayers cannot raise the issue before this Court because it was not presented to the Commission. The general rule is that an issue may not be presented to an appellate court that was not first presented to a lower tribunal. There are, however, exceptions to that rule. One such exception is that an issue need not be presented to an administrative agency if it cannot properly decide the issue. *See John-*

---

**16.** In its order denying USWC's motion for a stay, the Commission noted that it had granted USWC accelerated depreciation "over the past five years." In that connection, the Commission stated:

> The accelerated depreciation was intended to make new utility investment more attractive to USWC but the investments haven't been made

> even though the Company has had the benefit of the increased revenues from the depreciation. (Emphasis added.) There is no way of knowing on this record how much the accelerated depreciation rates and USWC's failure to invest funds generated thereby have contributed to USWC's extraordinary overearnings.

*son v. Utah State Retirement Office,* 621 P.2d 1234, 1237 (Utah 1980); *In re Tanner,* 549 P.2d 703 (Utah 1976); *see also* Kenneth C. Davis, *Administrative Law Text,* § 20.07, at 391 (1972).

Given the current state of the law, the Commission lacked power to award attorney fees to plaintiffs. In addition, because plaintiffs did not prevail on a single issue before the Commission, an application for attorney fees would have been wholly futile, even if there were statutory authority to award such fees. In short, the Commission had no power or factual basis for awarding plaintiffs attorney fees. Accordingly, we hold that we are not barred from considering plaintiffs' contention that they are entitled to attorney fees by virtue of the fact that they did not raise the issue before the Commission.

 We now address the merits of the claim. The general rule in Utah, and the traditional American rule, subject to certain exceptions, is that attorney fees cannot be recovered by a prevailing party unless a statute or contract authorizes such an award.[17] *Hall v. Cole,* 412 U.S. 1, 4, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973); *see, e.g., Baldwin v. Burton,* 850 P.2d 1188, 1198 (Utah 1993); *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988); *Turtle Management, Inc. v. Haggis Management, Inc.,* 645 P.2d 667, 671 (Utah 1982); *see also Govert Copier Painting v. Van Leeuwen,* 801 P.2d 163, 173 (Utah Ct.App.1990).

 However, in the absence of a statutory or contractual authorization, a court has inherent equitable power to award reasonable attorney fees when it deems it appropriate in the interest of justice and equity. In *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), the United States Supreme Court stated:

> Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," *Sprague v. Ticonic National Bank,* 307 U.S. 161, 166, 59 S.Ct. 777 [780], 83 L.Ed. 1184 (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery."

 Courts have exercised that inherent power in several categories of cases. One is when a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." James W. Moore et al., *Moore's Federal Practice* ¶ 54.77 (2d ed. 1972). In addition, an award of attorney fees is common in class action cases when nonparty class members are financially benefitted as a result of the efforts of a few litigants who successfully create a fund that benefits the entire class. *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 393–94, 90 S.Ct. 616, 626–27, 24 L.Ed.2d 593 (1970); *Weiss v. Bruno,* 83 Wash.2d 911, 523 P.2d 915, 916 (1974) (en banc). For example, in *Plumb v. State,* 809 P.2d 734, 739–40 (Utah 1990), attorney fees were awarded to named plaintiffs in a class action against the state for a monetary award that benefitted the entire class.[18] Courts also have exer-

---

17. Notwithstanding dictum in prior Utah cases that attorney fees are awardable only if there is a basis in contract or statute for such an award, we are unaware of any case that holds that attorney fees may never be awarded under a court's equitable powers. *See* Kellie Sager, Note, *Attorney Fees in Utah,* 1984 Utah L.Rev. 553, 557. In *Turtle Management, Inc. v. Haggis Management, Inc.,* 645 P.2d 667, 671 n. 1 (Utah 1982), the Court stated:

> There is an additional basis for attorney's fees in some special cases, known as the "common fund" or "equitable fund" doctrine, which has never been commented upon in the Utah cases, presumably because it was inapplicable. Under this doctrine, the fee of an attorney whose services create, increase, or preserve a fund or property to which others may also have a claim may be paid therefrom by order of a

court of equity.... This doctrine likewise has no applicability to the instant case.
(Citation omitted.)

18. Another expression of the inherent equitable power of a court to award attorney fees is recognized when a plaintiff's litigation confers "a substantial benefit on the members of an ascertainable class." *Hall,* 412 U.S. at 5, 93 S.Ct. at 1946; *see also Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Serrano v. Priest,* 20 Cal.3d 25, 141 Cal.Rptr. 315, 321, 569 P.2d 1303, 1309 (1977). In *Hall,* the Court stated:

> This exception has its origins in the "common fund" cases, which have traditionally awarded attorneys' fees to the successful plaintiff when his representative action creates or traces a "common fund," the economic benefit of

cised the inherent power to award attorney fees when a beneficiary sues a trustee for violation of the trust and obtains a recovery for all other beneficiaries whose rights were also violated by the trustee. *In re Estate of McCart,* 847 P.2d 184, 187 (Colo.Ct.App. 1992), *cert. denied* (Feb. 22, 1993) (unpublished opinion); *Robinson v. Kirbie,* 793 P.2d 315, 319 (Okla.Ct.App.1990); *Fred Hutchinson Cancer Research v. Holman,* 107 Wash.2d 693, 732 P.2d 974, 987 (1987); *Allard v. Pacific Nat'l Bank,* 99 Wash.2d 394, 663 P.2d 104, 112 (1983). Courts also have awarded attorney fees to a party as a "private attorney general" when the "vindication of a strong or societally important public policy" takes place and the necessary costs in doing so "transcend the individual plaintiff's pecuniary interest to an extent requiring subsidization." *Serrano v. Priest,* 20 Cal.3d 25, 141 Cal.Rptr. 315, 326, 569 P.2d 1303, 1314 (1977).

 We now turn to the present case. There is no doubt that the plaintiffs in this case have conferred substantial benefits on all USWC ratepayers. Based on the authorities discussed above, we conclude that the facts before us warrant an award of attorney fees to plaintiffs' counsel under this court's inherent equitable powers. On remand, the Commission is directed to determine the amount of time reasonably expended by plaintiffs' attorneys on the issues before the Commission and on appeal upon which plaintiffs have prevailed. In making this determination, the Commission should be guided by our prior decisions on making attorney fee awards. *E.g., Cabrera v. Cottrell,* 694 P.2d 622, 624–25 (Utah 1985).

To the extent the Commission finds, after consideration of the effects of today's ruling on the rate proceeding before it, that USWC must disgorge overcharges pursuant to an exception to the rule against retroactive ratemaking, plaintiffs' award of attorney fees should come out of that fund. *Mills,* 396 U.S. at 393–94, 90 S.Ct. at 626–27; *see Plumb,* 809 P.2d at 739–40.

In the alternative, if no such fund is created, we find that the private attorney general exception to the American rule is applicable to this case and that USWC should be ordered to pay those fees.[19] As set out throughout this opinion, plaintiffs have successfully vindicated an important public policy benefitting all of the ratepayers in the state. Plaintiffs, a handful of ratepayers acting entirely on their own, took on USWC, the Public Service Commission, and the Division of Public Utilities and have succeeded in having the Commission's rate of return set aside as unlawful, section 54-4-4.1(2) declared unconstitutional, and the Commission's "incentive" plan held invalid. It is significant that the Committee of Consumer Services, which by statute is charged with the responsibility of representing consumer interests, made no appearance at all on this appeal and that the Commission and Division of Public Utilities have opposed the ratepayers on all issues. The results achieved by the ratepayers will necessarily benefit all USWC ratepayers in the state of Utah especially as to future rates, irrespective of whether a refund of past overcharges might ultimately be ordered. Here, USWC has collected rates under a rate of return that is unlawful and was authorized by the Commission's unlawful "incentive regulation" order to retain revenues in excess of a reasonable rate of return. But for plaintiffs' action, all that would have been unchallenged, and none of USWC's ratepayers would ever have had any relief. In the absence of a common fund, and under these circumstances, it is appro-

---

which is shared by all members of the class. See, e.g., *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881).

412 U.S. at 6 n. 7, 93 S.Ct. at 1947 n. 7. As the California Supreme Court stated in *Serrano,* the substantial benefit exception "may be viewed as an outgrowth of the 'common fund' doctrine, [and] permits the award of fees when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a 'sub-

stantial benefit' of a pecuniary or nonpecuniary nature." 141 Cal.Rptr. at 321, 569 P.2d at 1309; *see also Weiss v. Bruno,* 83 Wash.2d 911, 523 P.2d 915, 916 (1974) (en banc).

**19.** In holding that the private attorney general doctrine applies here, we note the exceptional nature of this case. We further note that any future award of attorney fees under this doctrine will take an equally extraordinary case.

priate to require the shareholders of USWC to pay the cost of plaintiffs' reasonable attorney fees. *See Serrano,* 141 Cal.Rptr. at 326, 569 P.2d at 1314.

## VII. CONCLUSION

For the foregoing reasons, we hold that the 12.2% rate of return on equity is unlawful, that Utah Code Ann. § 54–4–4.1(2) is unconstitutional, that Utah Code Ann. § 54–4–4.1(1) incorporates cost-of-service criteria as a limitation on the types of incentive plans that may be adopted by the Commission, and that the Commission's incentive regulation plan in this case is invalid. We also hold that plaintiffs are entitled to attorney fees. We remand to the Commission for further proceedings.

ZIMMERMAN, C.J., and DURHAM, J., concur.

HOWE, Justice, concurring in the result in part and dissenting in part:

I concur in the result of parts I and II of the majority opinion. However, because the issue of the constitutionality of a public utility's veto power under Utah Code Ann. § 54–4–4.1(2) is not justiciable, I respectfully dissent as to parts III, IV, and V. I also dissent as to part VI because there is no statute authorizing the award of attorney fees and because a substantial part of the time and effort of the ratepayers' attorneys has been spent in pursuing moot issues, as explained in this opinion.

In the instant case, USWC proposed an incentive rate regulation plan which the Public Service Commission rejected. Pursuant to section 54–4–4.1(1), the Commission then formulated its own incentive rate plan, but USWC "elect[ed] not to proceed" with that plan. Utah Code Ann. § 54–4–4.1(2). The ratepayers argue that this veto power is an unconstitutional delegation of legislative and judicial power to a private party. USWC counters that the issue is moot because "no plan of any kind is now in effect under the powers granted to the Commission by Section 54–4–4.1."

In *Duran v. Morris,* 635 P.2d 43, 45 (Utah 1981), we held that "[i]f the requested judicial relief cannot affect the rights of the litigants, the case is moot and a court will normally refrain from adjudicating it on the merits." This is the case here. No incentive rate plans were left on the table after USWC vetoed the Commission's incentive rate plan. The Commission then ordered the traditional method of regulation, which the ratepayers have consistently regarded as desirable and lawful. Thus, the ratepayers' interest in maintaining traditional rate regulation of USWC has been realized, and declaring section 54–4–4.1(2) unconstitutional will not affect that interest. *See State v. Sims,* 881 P.2d 840 (Utah 1994) (holding case moot where ruling on constitutional question would have no legal effect on the parties).

The majority concludes that if this case is held to be moot, the constitutionality of the veto provision will escape review presumably because the veto will always operate to eliminate the plan authored under the authority of section 54–4–4.1. However, the absence of such a plan is not the reason this case is moot. It is moot because no party has sought to have the vetoed plan reinstated. Obviously, USWC objects to the plan because it vetoed it. The Commission has not appealed that veto, and the ratepayers have consistently opposed incentive rate regulation in general. By declaring the veto power unconstitutional, the majority revitalizes the vetoed incentive rate regulation plan formulated by the Commission, a result no party to this case seeks.

With the parties uniformly opposed to the legal effect of declaring section 54–4–4.1(2) unconstitutional, the majority's opinion amounts to nothing more than an advisory opinion. *See Merhish v. H.A. Folsom & Assocs.,* 646 P.2d 731, 732 (Utah 1982) (recognizing strong judicial policy against giving advisory opinions). We should wait to decide the constitutionality of section 54–4–4.1(2) until one or more parties favor the vetoed plan and argue for its reinstatement. Then a ruling on the constitutionality of the veto power will affect the interests of the litigants. Until then, it is not the province of this court "to exercise the delicate power of pronouncing a statute unconstitutional in abstract, hypothetical, or otherwise moot cases"

such as the one now before us. *Hoyle v. Monson*, 606 P.2d 240, 242 (Utah 1980).[1]

Furthermore, the ratepayers do not have standing to challenge the statute. The constitutionality of a statute cannot be attacked "by parties whose interests have not been, and are not about to be, prejudiced by the operation of the statute." *Id.; see also Cavaness v. Cox*, 598 P.2d 349, 351–52 (Utah 1979) (holding that party may challenge constitutionality of statute only when it is being or is about to be applied to his or her disadvantage); *Sims v. Smith*, 571 P.2d 586, 587 (Utah 1977) (holding that before party may attack constitutionality of statute, he or she must be adversely affected by that very statute).

The ratepayers' interests were not prejudiced by the operation of section 54–4–4.1(2). Rather, USWC's veto cleared the way for the Commission to order the traditional rate regulation which they seek. As we explained in *McRae v. Jackson*, 526 P.2d 1190 (Utah 1974), "The function of appellate courts, like that of courts generally, is not to give opinions on merely abstract or theoretical matters, but only to decide *actual controversies injuriously affecting the rights of some party* to the litigation." *Id.* at 1191 (emphasis added) (quoting 5 Am.Jur.2d *Appeal and Error* § 761 (1962)); *see also Reynolds*, 788 P.2d at 1045. Because section 54–4–4.1(2) did not operate to their disadvantage, the ratepayers lack standing to challenge its constitutionality.

Finally, the majority notes that USWC "vigorously argues that Utah Code Ann. § 54–4–4.1(1), the provision authorizing incentive rate regulation, is constitutional" and that the "ratepayers argue just as vigorously to the contrary."[2] It then reaches the question because it "is presented in the requisite adversarial context." However, "[a] constitutional question does not arise merely because it is raised and a decision is sought thereon." *Hoyle*, 606 P.2d at 242. The question must also be justiciable. In the recent case of *State v. Sims*, 881 P.2d 840 (Utah 1994), we held that the question of the constitutionality of a roadblock under the Utah Constitution was moot even though both parties had briefed and argued the question and sought our opinion. We declined because any opinion "would have no legal effect on the parties." *Id.* at 842.

By declaring the veto power in section 54–4–4.1(2) unconstitutional, the majority breathes life into the Commission's incentive rate plan but then quickly proceeds to shoot the plan down by finding it unlawful. This contradictory course is unwarranted. The constitutionality of section 54–4–4.1(2) as presented in this case is a nonjusticiable question. That being the case, it is unnecessary to decide the severability of section 54–4–4.1(1) or the lawfulness of the Commission's incentive rate plan under that section.

HALL, J., heard the arguments but retired before he could act on the opinion.

---

1. The exceptions to the mootness doctrine do not apply. *See Sims*, 881 P.2d at 842 (listing exceptions to mootness doctrine) (citing *Reynolds v. Reynolds*, 788 P.2d 1044, 1045–46 (Utah Ct.App. 1990)). As explained, while capable of repetition, the instant case is not "likely [to] escape judicial review." *Wickham v. Fisher*, 629 P.2d 896, 899 (Utah 1981). Likewise, no "irreparable injury" will result if the case is not decided immediately, *In re J.P.*, 648 P.2d 1364, 1371 (Utah 1982), and the controversy has not contin-

ued to exist "after the issue has become moot for the litigants." *Reynolds*, 788 P.2d at 1046. USWC's veto of the Commission's incentive rate plan advanced the ratepayers' interest in maintaining traditional rate regulation, and no party argues for reinstatement of that plan.

2. USWC argues the constitutional question in the alternative, stating that its constitutional arguments "are only relevant if the Court declines to rule that those issues are moot."